ELIZABETH P. PETERS ET AL.

*vs.*

JAMES E. HIGNUTT.

*Mortgage—Procurement by Fraud—Evidence—Laches—
Presumption of Payment.* ·

In a proceeding to set aside a mortgage to the mortgagor's
brother, as having been procured by fraud practiced on the
mortgagor during a severe illness, not instituted till twenty-six
years after the date of the mortgage, and after the death of the ·
mortgagee and of the others present at the execution of the
mortgage, *held* that relief should be refused.          pp. 26-32

One seeking to set aside a mortgage as having been procured
from him by fraud while extremely ill, *held* guilty of laches in
failing to take steps to vacate the mortgage until eighteen years
after he knew thereof, during which time the mortgagee and the
last surviving witness died.          p. 33

A mortgage cannot be vacated on the theory of a presumption
of payment from lapse of time, if a part payment thereon was
made within twenty years before the filing of the bill.          p. 34

*Decided February 2nd, 1921.*

Appeal from the Circuit Court for Caroline County (AD-
KINS, C. J., and HOPPER, J.).

The cause was argued before BOYD, C. J., BRISCOE,
THOMAS, PATTISON, URNER, STOCKBRIDGE, and OFFUTT, JJ.

*Henry R. Lewis*, with whom were *Lewis & Knolls* on the
brief, for the appellants.

*T. Alan Goldsborough* and *James E. Hignutt*, for the ap-
pellee.

Boyd, C. J., delivered the opinion of the court.

This is an appeal from a decree which declared void and vacated a mortgage from James E. Hignutt to Dr. John W. Hignutt, dated the first day of January, 1892, and recorded in the land records of Caroline County on the next day, which purported to be for an indebtedness then due the mortgagee by the mortgagor in the sum of $1,000. On the 4th day of March, 1901, the mortgage was assigned to Annie H. Peters, now deceased. She was the mother of Elizabeth P. Peters, and wife of William R. Peters, the defendants in this case, who are alleged to be "her sole heirs at law and personal representatives." There is nothing in the record to show that they ever qualified as executors or administrators, but no point is made of that, and the answer admits the allegations of the paragraph of the bill in which that statement is contained.

The bill alleges that on January 1st, 1892, at a time when plaintiff was extremely ill with pneumonia, and considered in a dying condition, at the house of John W. Hignutt, he was coerced into executing a mortgage of one thousand dollars on a farm owned by him to the said John W. Hignutt, a certified copy of which is filed. It also alleges that he was not indebted to John W. Hignutt, but on the contrary the latter was indebted to him, that he never at any time received any consideration for executing the mortgage, that Annie H. Peters was not a purchaser for value of the mortgage, and that the plaintiff had demanded that it be released, which was refused. The plaintiff admits that he signed the mortgage but in his bill alleges:

> "That without any previous consultation whatever with him a discussion took place in the sick room between the said John W. Hignutt and others as to how much the mortgage should be; this your orator recollects, but as to the execution of the said mortgage your orator has not now nor has ever had any recollection, so that he has no personal knowledge of the actual execution of the said mortgage."

The case presents some peculiar conditions. The plaintiff is a member of the bar of Caroline County. He was eighty-three years of age when he testified in March, 1919, and hence was fifty-six years of age when the mortgage was given. He testified that Messrs. B. G. Stevens, Robert J. Jump, William W. Lowe and Dr. Hignutt were in his room at the time mentioned above; that someone said, "what shall be the amount, consideration of the mortgage, Dr. Hignutt said that $500 was enough. Mr. B. G. Stevens says, make it $1,000. Dr. Hignutt said it didn't make any differnce what the amount is." He was then asked: "What if anything further do you remember about the transaction?" and replied: "I don't remember anything further. Mr. Jump appeared to be at work on the paper and I went off, I was unconscious after that. Part of the time it roused me up, their being in there and talking about a mortgage, that aroused me. I remember a good many things when I was sick, that is when I was aroused up, but as soon as I got to rest I knew nothing." He said he did not know that those persons were coming there, and nothing had been said to him about a mortgage. Dr. Hignutt died on the 13th day of January, 1903, eleven years after the mortgage was given, and did not assign it until March 4, 1901. William W. Lowe was the justice of the peace who took the acknowledgment, and the mortgagee made oath as to the consideration before him. .

There is no evidence that plaintiff was "coerced into executing" the mortgage, as the bill alleges. There is no testimony on the subject excepting that of the plaintiff, every one of the others present at its execution being dead before the bill was filed, and the plaintiff was positive that he remembered nothing about the execution, although he admits his signature. When we remember that the plaintiff is an attorney, and could recall what he testified to as occurring twenty-seven years before his testimony was given, it is difficult to understand why he did not, upon his recovery, or at least in a reasonable time afterwards, follow the matter up and see what had been done, if he did not owe his brother

anything. It is almost inconceivable that the brother and the three other persons present would deliberately commit such a fraud, as it was if the plaintiff is correct.

There is nothing else in the record to indicate that Dr. Hignutt would thus take advantage of his brother, and there could have been no possible reason, so far as the record discloses, for the others present entering into a conspiracy to defraud this ill man, who was apparently of very limited means. Dr. Hignutt swore to the consideration named in the mortgage as provided in the statute.

If what we have already said stood alone, it would be exceedingly dangerous to grant the relief prayed for, so long after the death of the mortgagee and the other three persons who were present, but there is strong documentary evidence in support of the contention of the defendants. Dr. Hignutt and the plaintiff, on the 16th day of June, 1900, in consideration of $300, conveyed to George R. Neal three parcels of ground in Caroline County, which are described by courses and distances, and at the end of the description is this statement "being three parcels of the same land named in a mortgage dated the first day of January, in the year eighteen hundred and ninety-two, from James E. Hignutt to Dr. John W. Hignutt," and then giving the place of record. That is the mortgage in dispute, as shown by the names of the parties, the date and the place of record set out in the certified copy filed. The learned judges below were of the opinion that the plaintiff did not have any interest in the lots sold to Neal when he made the mortgage or afterwards, and that hence Dr. Hignutt did not join in the deed to release the mortgage, but the plaintiff testified that his father had sold parts of the property to several colored persons, who had not paid anything for them, and, in order to get the titles in such shape that they could be readily sold, he as trustee of his father joined with those parties in a deed to Dr. Hignutt for that purpose, but "he paid me no consideration for the lot." Indeed he testified that he paid the three hundred dollars received from Neal to Dr. Hignutt, but claimed that it was on

what is spoken of as "the Ann Thomas mortgage," thus show-
ing that he did claim the consideration paid by Neal. But
regardless of that, the reference to the mortgage in the Neal
deed shows that he did know of it on June 16, 1900, two
years and seven months before his brother's death, and not
only knew of it, but he and his brother, for some reason, re-
ferred to it in their joint deed to Neal. It would be difficult
to find more conclusive evidence of his knowledge of the ex-
istence of the mortgage, and that too eighteen years before
he filed his bill to have it declared null and void for the rea-
sons stated. We do not know whether he drew the deed, but
he must have known that the mortgage was referred to in it.

That payment of three hundred dollars becomes a very im-
portant question in the case. As we have seen, the plaintiff
claims that he paid it on account of what is spoken of as
"the Ann Thomas mortgage," which on the 18th of March,
1886, he had given to John W. Hignutt, attorney in fact for
Ann Thomas, to secure a loan of five hundred dollars. The
defendants claim that the sum of three hundred dollars was
paid on account of the mortgage now before us. The record
shows that "the Ann Thomas mortgage" was released by J.
W. Hignutt, attorney for Ann Thomas, on the 6th day of
February, 1890—over ten years before the three hundred dol-
lar payment was made—and hence it could not have been paid
on that mortgage. In the opinion of the lower court it is
said, "the date of the recordation of this release does not
appear in the record," but the certified copy of the mortgage
and release thereon states: "The above mortgage was re-
leased on the record as of the sixth day of February, 1890,"
and the release was attested by L. H. Gadd, clerk. The plain-
tiff testified that he did not know that it had been released,
but if he had forgotten that, John W. Hignutt certainly knew
it, and would not have credited three hundred dollars on a
mortgage which had been long since released, when he held
one that was unpaid.

William R. Peters, one of the defendants, was asked
whether he was present at a conversation in his house between

the plaintiff and Dr. Hignutt in regard to the purchase money for a certain piece of land that had been sold to George R. Neal, and, if so, to state what was said. He answered as follows: "A. James E. Hignutt came to my house, I think in 1900. Without referring to the papers, I cannot just tell the date, and brought $300 and gave it to Dr. Hignutt. Dr. Hignutt, in James E. Hignutt's presence told me to get Jimmie's mortgage and credit this on it. Q. Well, what did you do? A. I got the mortgage out of the little safe there was there and credited the $300 on the mortgage and while in there Mr. Hignutt asked Dr. Hignutt—meaning James E. Hignutt—asked the doctor for $25 and he gave it to him, told me to, which I did in his presence."

He also testified that he wrote a receipt for the three hundred dollars, which he gave to the plaintiff. Upon production of the receipt it appears that the plaintiff, and not Mr. Peters, wrote it, but such a mistake might readily be made after the expiration of nineteen years between the time it was written and the date of the testimony. The receipt was written by the plaintiff, and is as follows: "Received this thirtieth day of June, 1900, of James E. Hignutt, three hundred dollars ($300) in part payment of the principal on the mortgage against James E. Hignutt," and it was signed by J. W. Hignutt. There was written on the original mortgage: "1890 June by cash $300. From sales of lots sold to G. R. Neal." It is impossible for us to agree, in the face of this evidence, with the contention of the plaintiff that the three hundred dollars were not paid on the mortgage now being attacked. That was the only mortgage which the plaintiff then owed Dr. Hignutt, and, as we have seen, the Ann Thomas mortgage, to which he claims to have applied the three hundred dollars, was not then and had not been in existence for over ten years. When we remember that the plaintiff had joined with his brother in the deed to Neal which refers to the mortgage, just two weeks before the payment, and that said sum was received from Neal as the consideration for that deed, we can reach no other conclusion than that the payment

was intended by the plaintiff and was accepted by Dr. Hignutt as a credit on the mortgage involved in this case. If the plaintiff intended the reference in the receipt to refer to a mortgage other than the one referred to in the deed to Neal, he could have said so in the receipt, but, as we have seen, there was no other mortgage to which it could refer. The language of the receipt indicates that the interest up to the time of the payment had either been paid or had been in some way discharged by Dr. Hignutt, as the receipt was "in part payment of the principal." If the plaintiff is correct in saying Dr. Hignutt had owed him as trustee $750, on which he had only paid $235, it is possible that the release of the Ann Thomas mortgage was intended to be applied to that balance, which would have been $515. There certainly must have been some reason for the release, and it is difficult to understand why the plaintiff would have permitted the balance he claimed was due from his brother to him as trustee to remain unpaid for such a length of time, especially if the Ann Thomas mortgage was still in existence.

The plaintiff sold a little over five acres of land included in this mortgage to T. Frederick Garey in the early part of 1918. He testified that somebody told Mr. Garey "about this old mortgage that was signed when I was sick and he wanted it released." He went to see Mr. Peters, who lived in Delaware, and testified: "I told him he and I knew more about that $1,000 than anybody else and that it ought to be settled in our lifetime and he offered readily to release on the four acres and I told him I wanted the whole thing released. I never got a cent for it, and I didn't owe it and he asked me what I would do. I told him I would give a check for $100, and give Elizabeth my note for $200, and he said that if I got Mr. Lewis to prepare a deed and send it over to him that he and Elizabeth would sign it." He further said: "Mr. Lewis did prepare a deed for Mr. Garey, and sent it over and he sent it back. There was no consideration given for his doing it, either, not one penny. He promised me then that he and Elizabeth would come over here and release the bal-

ance of it," etc. Mr. Peters testified that the plaintiff never mentioned a release of the entire mortgage, only for the piece of land sold Mr. Garey, and that he never in his presence claimed or stated that he did not owe the mortgage, that the first notice he ever had relative to the validity of the mortgage was from Mr. Goldsborough, who is plaintiff's attorney in this case. There was, therefore, a direct conflict on that question between the two witnesses, but Mr. Peters and his daughter did unite with the plaintiff in a deed to Mr. Garey for five acres and a fraction, which was dated the 27th of February, 1918, and referred to Mr. and Miss Peters as "husband and heir at law respectively of Anna H. Peters, deceased, who was the owner of a mortgage on certain real estate in Caroline County, Maryland, belonging to the said James E. Hignutt, of which hereinafter described parcel of land is a part," and stated that they joined in the deed for the purpose of conveying a clear title "free and discharged from the operation and effect of the said mortgage." That deed was duly recorded. The plaintiff apparently understood that the mortgage was to be released, as on the 25th of February, 1918, he sent a check for a hundred dollars, undated but payable to Elizabeth Peters, also a note dated February 25, 1918, payable to her fifteen months after date, and a letter from Mr. Lewis, explaining how the mortgage could be released, in which letter Mr. Lewis said the plaintiff had told him that he and Mr. Peters had come to an agreement about the mortgage. Mr. Peters returned the check and note, and two days after the date of plaintiff's letter executed the deed for the five acres, as stated above, but declined to release the whole mortgage. On September 19th, 1918, the bill of complaint before us was filed.

We have thus referred at considerable length to what we regard as the relevant facts, as they appear in the record, as they are in our judgment conclusive of the case. We do not question the integrity of the plaintiff, indeed both sides spoke of him at the argument in very high terms, but this is a striking illustration of the danger of courts setting aside instru-

ments after such a long period as almost necessarily makes the recollection of witnesses uncertain, not to say unreliable, especially if death has intervened and prevented others from giving their versions of what took place, and explaining circumstances which might shed fuller light upon the transaction. It must be admitted that it was unusual for nothing to be done towards enforcing the payment of this mortgage during all those years, either by the original mortgagee, his assignee or her representatives, but it is quite possible that none of them were willing to disturb the plaintiff, whose means were evidently very limited, and who was a brother of the mortgagee and uncle of the assignee. There is ample, however, to show that Dr. Hignutt regarded the mortgage as valid for at least $700, after payment of the $300 on the principal, when he assigned it on March 4th, 1901, which assignment was placed on record the next day. Although the payment of the $300 was endorsed on the original mortgage by the husband of the assignee, at the direction of Dr. Hignutt, it would have been better to have stated in the assignment the amount then due, but the plaintiff testified that his brother was not a good business man and he may have thought that the endorsement of a credit on the mortgage was sufficient.

The questions of law involved are too well settled to require an extended discussion of them. It will be remembered that the bill of complaint was filed over twenty-six years after the mortgage sought to be vacated was executed and placed on record. There is no evidence in the record which could have justified delay, at least after the plaintiff was aware of the existence of the mortgage, unless it be the understanding he had that William R. Peters had agreed to release the mortgage, but that was only six or seven months before the bill was filed. It might well be contended that what the plaintiff admits he heard the day the mortgage purports to have been executed was sufficient to put him on inquiry. In *Dall Co. v. Butcher*, 135 Md. 25, it is said: "There must be due diligence in the application for relief,

and time runs from the time the mistake was discovered, or could have been discovered by due diligence." There the bill was filed to reform a written contract on the ground of mistake. The subject of laches was so well treated by JUDGE PHELPS in his work on *Juridical Equity,* Secs. 260-272, that it is sufficient to refer to it, instead of citing many cases. After referring to the familiar principles so often announced, that relief may be refused on the ground of laches although a shorter time has elapsed than fixed by the statute of limitations, and that each case must be governed by its own circumstances, he says in section 263: "The following circumstances attending the delay have been held to characterize a case of laches: The intervention of an important death; especially, when the circumstance is colored by indications of 'lying-by,' " etc. That is approved in a number of cases, one of the latest being *Safe Dep. & T. Co.* v. *Coyle,* 133 Md. 343. The lower court placed much reliance on *Demuth* v. *Old Town Bank,* 85 Md. 315. In *White* v. *Shaffer,* 130 Md. 362, JUDGE BURKE, in speaking for this Court, referred at length to that case and pointed out that what was there "decided was that the bank was under no obligation to foreclose the mortgage and no injury or prejudice to the plaintiff resulted from its failure to do so." That was a very different case from this and we find nothing in it which could excuse the plaintiff for his delay. If he was going to attack the mortgage on the ground of fraud, it was clearly his duty to do so within a reasonable time after he discovered the fraud. There was manifest injury and prejudice to the adverse party by his failure to do so, as the mortgagee and the three others present at the time of the execution of the mortgage died some years before he filed his bill. He certainly knew of the mortgage being on record as early as June 16, 1900, when the deed to Neal was executed, but he did not take any steps to vacate it for eighteen years after that time. The mortgagee was still living then, and B. G. Stevens was also, according to the evidence of William R. Peters, who testified that he did not remember exactly when he died but probably

four or five years before he gave his testimony in 1919. It does not seem to be shown when the other two died, but it was conceded to have been some years before the bill was filed. So without discussing that subject further, we are of the opinion that this is a typical case of laches, and relief should have been refused on that ground, regardless of other questions.

The case of *Brown* v. *Hardcastle,* 63 Md. 488, announces the doctrine that "the presumption of payment in favor of a mortgagor in possession over twenty years is not conclusive, but may be rebutted by evidence of part payment of principal or interest, or by admissions of the debt's existence, or other circumstances from which it may be inferred the debt has not been paid. In other words a recognition of the mortgage debt involving a promise to pay it will remove the bar of the statute of limitations." In the same case there is a quotation from *Stump* v. *Henry,* 6 Md. 209, that "payment of part of a mortgage will prevent it being barred by limitations for twenty years afterwards, although the mortgagor may have been in possession for nineteen years and upwards prior to the payment." See also *Subers* v. *Hurlock,* 82 Md. 42; *Buchanan* v. *Lloyd,* 88 Md. 642; and *Goldman* v. *Miles,* 129 Md. 180.

So without meaning to indicate that relief could have been granted under this bill (which is based on the invalidity of the mortgage) by reason of the time that had elapsed since it became due, if nothing had been done which removed the bar of the statute of limitations, as we are satisfied that the payment of the three hundred dollars was made on this mortgage and as that was within twenty years before the bill was filed, it is clear that no relief could be granted in this case on the theory that the mortgage was presumed to have been paid. It follows from what we have said that the decree must be reversed and the bill dismissed. It is unnecessary to discuss the exceptions to testimony or the rulings thereon.

*Decree reversed and bill of complaint dismissed, the appellee to pay the costs.*