CHARLES N. BOULDEN ET AL. *vs.* LAURA J. WOOD ET AL.

*Reformation of Deed—Mistake of Draftsman—Covenant of Warranty.*

A written contract between A and B provided that A should convey to B a farm in Virginia subject to a certain mortgage thereon and also pay a certain sum of money and that B in consideration thereof should convey certain leasehold lots of ground to A. The money agreed upon was paid by A and the leasehold lots conveyed to him by B, but the deed conveying the farm with general warranty from A to B made no reference to the mortgage. B died without having put this deed upon record and the farm was afterward sold under the mortgage. B's heirs claimed damages from A for breach of the covenant of general warranty in the deed. Upon a bill against these heirs by A to reform the deed of the farm so as to make the grant subject to the mortgage, the evidence clearly established that the omission of all references to the mortgage in the deed was owing to the error of the draftsman of the deed, who had been instructed to prepare it in conformity with the contract of sale and that neither A nor B was aware of the mistake. *Held,*

1st. That A is entitled to have the deed reformed so as to correspond with the contract.

2nd. That the administrator of B is not a necessary party to the bill, because, the mortgage on the farm having been foreclosed after B's death, no right of action on the covenant of warranty had accrued during his lifetime.

Appeal from a decree of the Circuit Court of Baltimore City, (STOCKBRIDGE, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE and JONES, JJ.

*A. Bernard Chancellor* and *Charles F. Stein,* for the appellant.

*E. P. Keech, Jr.,* (with whom were *A. H. Taylor* and *J. P. Bruns* on the brief), for the appellees.

· FOWLER, J., delivered the opinion of the Court.

The bill in this case is filed by Charles N. Boulden and
Emma V. Boulden, his wife, against Laura J. Wood, widow
of Samuel Wood and her two infant children.

The bill alleges that the plaintiffs being the owners of a
farm in Accomac County, Virginia, entered into a written con-
tract with Samuel Wood, through his agent, Charles Morton,
to exchange their farm in Virginia for certain leasehold prop-
erty in Baltimore City.     ᴵ ·

The agreement was made on the·19th July, 1897, between
Charles Morton, agent .of Samuel Wood of the city of Bal-
timore, on the one side, and Charles N. Boulden of said city
and State, on the other.    Without reciting the agreement lit-
erally it is sufficient to say that .Boulden, the plaintiff, agrees
to pay to Wood eighteen hundred dollars in cash and convey
to him his farm in Virginia in exchange for certain leasehold  ·
property owned by Wood in Baltimore City.    In the agree-
ment, after referring to the Virginia farm as being the same
property that was conveyed to Boulden by St. George W.
Teackle, by deed dated April, 1895, and recorded, &c., this
·language is used, "Together with all the rights, &c., *but sub-
ject nevertheless to the·operation of a mortgage of one thousand
dollars thereon.*"    The properties which Wood agreed to con-
vey to Boulden in exchange for the Virginia farm and $1,800
cash are described in the agreement as "all that property sit-
uated in the city of Baltimore known as Nos. 2610, 2612,
2614, 2616, 2618 West North Avenue, subject to ground
rents of $90 each, and also No. 1536 Riverside Avenue, sub-
ject to a ground rent of $35."    Subsequently Boulden and
his wife executed and delivered to Wood a deed for the Vir-
ginia farm and paid to him the stipulated amount of cash, less
the proper allowances, and Wood on his· part executed and
delivered to Boulden and wife a deed for his leasehold prop-
erty described in the written agreement.

In the fifth paragraph of the bill the plaintiffs allege that
except for the understanding set forth in the written agree-
ment with said Wood that he was to take the Virginia farm

subject to the $1,000 mortgage and without the plaintiffs being in any way liable to him to pay said mortgage or to indemnify and warrant him against any loss he might sustain by reason thereof, they would not have entered into the agreement aforesaid, for any other agreement would have been a very disadvantageous contract for them and would have made them pay to Wood for his Baltimore properties a price far in excess of their value at the time of said transaction or since.

In the sixth paragraph the plaintiffs allege that they were not aware at the time of the transfer that their deed omitted any reference to said mortgage, and only became aware of such omission recently when threatened with suit by these defendants and the administrator of said Wood.

It is alleged in the seventh paragraph of the bill that Wood never recorded the deed of the plaintiffs to him in his lifetime and it has not been recorded since his death, and that, therefore, the plaintiffs had no access to said deed and were unable to procure a copy thereof until the last few months, and that by reason of said deed not having been drawn in conformity with said agreement the plaintiffs are threatened with suit at law by these defendants, who claim large damages by reason of the general warranty contained in said deed, in spite of the fact that these defendants and said Wood's administrator are fully aware that the Virginia farm was sold to said Wood subject to said mortgage, as set forth in said written agreement of exchange and sale.

Finally it is alleged in the bill that Wood died intestate April 9th, 1898, about eight months after the execution and delivery to him of said deed leaving as his only heirs at law and next of kin, his widow, Laura J. Wood and two infant children above named.

The prayer is (1) That the defendants answer under oath and bring the original deed from these plaintiffs to said Wood into Court. (2) That the said deed may be reformed so as to be in conformity to the said written agreement, and (3) for general relief. Plaintiffs filed with their bill copies of their deed to Wood, of the mortgage of $1,000 referred to in the

agreement, and of the deed from Wood to them of the Balti-
more City property.

The defendants answered as required under oath and set up
the deed of the Virginia land as a good and sufficient deed
under the law of Virginia to convey the same in fee-simple,
with a covenant of general warranty; they aver that the writ-
ten contract relied on by the plaintiffs is not the contract of
the said Wood; that one Teakle being the owner of the Vir-
ginia farm conveyed it October 19th, 1893, to one Susan
Rogers, by way of mortgage to secure the payment of $1,000,
and that on 19th June, 1895, said Teakle and wife conveyed
said Virginia land to the plaintiffs in fee-simple with covenant
of general warranty in consideration of $4,000; that the plain-
tiffs conveyed said land to Wood with general warranty in con-
sideration of $3,500; that on the same day said Wood assigned
to the plaintiffs his said leasehold property in Baltimore City
in consideration of $6,800; that said Susan Rogers the mort-
gagee named in said mortgage on the 18th August, 1897, in-
stituted a chancery suit in the Circuit Court for Accomac
County, Virginia, to foreclose said mortgage and that a decree
was subsequently passed, in accordance with which decree the
said land was sold on the 28th September, 1898, to one Charles
E. Nicolls, which said sale was finally ratified and confirmed.
The defendants deny all knowledge of the written contract
and facts surrounding the exchange of properties made by the
plaintiffs and said Wood, and aver that the deed from the
plaintiffs represents the true intention of the parties. There
are other allegations in the answer which we do not deem it
necessary now to mention.

The answer concludes with a motion to dismiss the bill for
want of proper parties and praying that it may be taken as a
cross-bill, &c. The learned Court below dismissed the bill,
but as no opinion was filed we are not informed of the grounds
of his conclusion.

We have thus fully set forth the allegations of the bill and
answer, because it appears to us there is nothing remaining to
be done but to examine the testimony to ascertain whether the

evidence sustains the allegations of the one or the other. The bill alleges clearly and fully that a mistake was made by the omission from the deed of the provision in regard to the mortgage. That this omission was a *mutual mistake* necessarily follows from the conceded facts. If the written contract is the contract of both parties, and this is clear beyond doubt from the testimony, then both parties intended that the Virginia land was to be conveyed to Wood subject to the mortgage. It is true that in their answer the defendants deny *that this contract*, is the contract of Wood ; but by the testimony of the witnesses Geissendaffer, Sarah E. Meacham, H. Edgar Johnson, Harvey H. Rouzer, Charles N. Boulden, Emma V. Boulden and Charles Morton, it is proved beyond doubt, we think, that Mr. Morton was fully authorized to represent Mr. Wood in the whole transaction as his agent, including the signing of the contract. He certainly never denied such agency during his lifetime and he had ample opportunity to do so. He knew Mr. Morton had signed the contract as his agent and having recognized him as such, these defendants will not now be allowed to deny the agency merely because they had no knowledge of it. Nor is there any evidence whatever in the record to show that the contract set forth in the agreement was ever varied or changed by any subsequent agreement between the parties.

This brings us, however, to the controlling question in the case and to a consideration of the position taken by the defendants. That position is that conceding that the written contract of the parties for the contemplated sale and exchange of their respective properties provided that the Virginia land was to be conveyed by the plaintiffs to Mr. Wood subject to the mortgage, yet as such a provision was omitted from the deed, a Court of equity will not afford relief to the plaintiffs. Doubtless there are many cases in which Courts of equity have refused to reform written instruments. The general rule is thus stated in *Bispham's Equity*, sec. 469. "A person who seeks to rectify a deed on the ground of mistake must establish, in *the clearest and most satisfactory manner*, that the al-

leged intention to which he desires it to be made conformable continued concurrently, in the minds of all parties, down to the time of its execution, and also must be able to show exactly and precisely the form to which the deed ought to be brought." And in *Adams' Equity*, pp. 169, 170, it is said: "The *prima facie* presumption of law is, that the written contract shows the ultimate intention, and that all previous proposals and arrangements, so far as they may be inconsistent with the contract, have been deliberately abandoned. It seems, however, that the instrument may be corrected if it is admitted or proved that it has been made in pursuance of a prior agreement, by the terms of which both parties meant to abide, but with which it is in fact inconsistent; or if is admitted or proved that an instrument intended by both parties to be prepared in one form, has, by reason of some undesigned insertion or omission been prepared and executed in another. *So again where a solicitor, being instructed to prepare a settlement of a particular sum, inserted by mistake double the amount and the settlement was executed without discovery of the mistake, a bill was sustained to rectify it."* These general principles have been frequently announced by this Court and elsewhere. *Keedy* v. *Nally*, 63 Md. 311; *Bank* v. *Wrightson*, 63 Md. 81; *Ins. Co.* v. *Butler*, 55 Md. 238, *Bond* v. *Dorsey*, 65 Md. 314; *Wood* v. *Patterson*, 4 Md. Chan. 335, note A. These being the general principles which are to guide us, what are the facts which are either proven or conceded?

In the first place the proof is overwhelming that there was a mistake, that the mistake was mutual and that it continued down to the time of the execution of the deed and indeed after that time, for the uncontradicted testimony of the witness Boulden is that the settlement he made with Woods, after the execution of the deeds was upon the clear understanding that the latter was thereafter to pay the interest on the mortgage. It appears also by the testimony of Mrs. Meacham, which is also uncontradicted, that Wood said he made the transaction with the plaintiffs to get rid of his Baltimore property and get the cash $1,800. His language was

as repeated by the witness: "I can get more cash from Boulden than any other offer by taking the farm with the mortgage on it, for after awhile the woman (the mortgagee), will have to take the farm for the mortgage, for I will never pay it. I will get rid of all my property if I have to give it away." The testimony of the witness who prepared the deed is clear and strong to the point that he was authorized by Mr. Morton, the agent of Mr. Wood, to draw the deed in conformity with the terms of the agreement, which he had also prepared, and he admitted that the omission of the reference to "the $1,000 mortgage" must be attributed to his own neglect. *Cook* v. *Husbands*, 11 Md. 492. So also we think the testimony shows clearly and satisfactorily "exactly and precisely the form to which the deed ought to be brought" (*Adams' Equity, supra*), for the bill prays that the deed may be so drawn as to make it convey the Virginia land subject to the effect of the mortgage. Surely this is not a difficult or uncertain task for a draftsman of even limited skill.

But it is objected that the mistake was caused by the negligence of the plaintiffs and that therefore they are not entitled to relief. In support of this position it is said that the plaintiffs had an opportunity to read the deed and if they did not read it, it was gross negligence on their part. If this general proposition were correct it would follow that a Court of equity never would reform a written instrument at the instance of one of the parties to it; but we know this is not so. Whether the Court will or will not correct the mistake must depend upon the circumstances of each case. What are the facts surrounding the execution of this deed? Wood, the grantee, *had the deed prepared*, and *a few minutes before* it was executed he showed it to the plaintiffs. Knowing that the deed was to convey the land subject to the mortgage they might perhaps properly assume it was so drawn, but not satisfied with this presumption one of them, Mrs. Boulden, testifies, and her testimony is not successfully contradicted, that she asked the question before she signed the deed, whether it carried the mortgage on the farm with it, and she was told by Mr. Wood

that it did. Mr. Hannibal, a witness on behalf of the defend-
ants testified that he did not hear any conversation about the
mortgage, but he does not contradict Mrs. Boulden, nor does
anybody else. Now whether Mr. Wood told her what she
swears he told her or remained silent is immaterial, for in
either case neither he nor the defendants will be allowed to profit
by a mistake made under such circumstances. Indeed it is
not only possible but it is more than probable that Mr. Wood
himself was, during the balance of his life, some eight months,
under the same impression the plaintiffs had, otherwise it is
difficult to understand why he did not put the deed upon rec-
ord. And the testimony hereinbefore referred to shows clearly
that the reason he did not record the deed was, because if he
did so he would make himself responsible for the mortgage.
And how after his death, his widow having been enlightened
perhaps by the advice of counsel, has brought suit to recover
damages upon the theory that the deed as it now stands, con-
veyed the land with a covenant of general warranty, free from
and not subject to the mortgage.

It was also suggested that if the deed be reformed as prayed
the result would be that the plaintiffs would get valuable prop-
erty in Baltimore City for $1,800—the farm in Virginia having
been taken from the defendants by sale under the mortgage.
But whatever may have been the value of Mr. Wood's lease-
hold property in the opinion of some of the witnesses, and even
of the building association which loaned on it, it is certain from
the testimony, if we are to believe uncontradicted, reputable
witnesses that Wood himself placed very little value on it, for
he was willing to let it go for $1,800 and a farm which he said
was not worth more than the mortgage. He had loaned $4,000
on this leasehold property some years before this transaction
took place and the inference from the testimony is that not
being able to sell it, he was compelled to accept it for the
mortgage debt. The houses, or most of them, were unfinished
and without tenants and heavy ground rents on them. No
wonder he was anxious to get rid of them as testified by his
agent, Mr. Charles Morton. Doubtless Wood was telling the

simple truth when he said he could get more out of Boulden than anybody else.

Finally it was contended by the defendants that, if for no other reason, the bill was properly dismissed because of the absence of a necessary party, to wit, the administrator *d. b. n.* of Wood. This view is based upon the theory that there was a breach of the covenant of warranty upon the entry of the decree of the mortgage foreclosure proceedings in Accomac County, Virginia, that decree, according to the view of defendants, relating back to the first day of the term of the Circuit Court for Accomac County, Virginia, which was the 5th April, 1898, Wood having died a few days thereafter on the 9th of the same month—and that therefore the breach of the covenant having occurred during the lifetime of Wood it became a *chose in action* of said Wood and passed to his personal representative. But the difficulty in the way of this argument is that there was no breach during the life of Wood, because there was no eviction. It was not until after his death that the foreclosure sale was ratified and certainly not until after the sale that the purchaser could take possession. It is laid down in all the authorities that to constitute a breach of the covenant of warranty there must be an eviction of the covenantee under a paramount title. 8 *Am. & Eng. Ency. of Law,* p. 98. And says Mr. Poe (*Pleading,* sec. 349, p. 432), "upon breach of covenant of warranty, by the *eviction* of the deceased in his lifetime, the right of action *then* vested in him passes to the personal representative." But there must be an eviction before there can be a recovery for breach of the covenant, the reason of the rule being as expressed in 8 *Am. & Eng. Ency., supra,* "that the covenantee who has obtained possession, should not be permitted to recover for breach of the covenant for a mere failure or defect of title so long as he is left in possession, as he may never be disturbed and thus he may never suffer damage."

It follows, therefore, that we are of opinion that the decree of the Circuit Court of Baltimore City dismissing the bill must be reversed, and the cause remanded in order that a decree

may be passed reforming the deed from the plaintiffs to Samuel Wood, as prayed.

*Decree reversed with costs and cause remanded.*