THE WILLIAM DALL COMPANY, a Corporation,

vs.

DAVID C. BUTCHER and CHARLES H. WILLIAMS,
Co-Partners, Trading as Butcher & Williams.

*Mistake—Reformation of Instrument—Laches.*

Before a written instrument can be reformed by a court of equity on the ground of mistake, it must appear that the mistake was mutual; and the mistake must be proved beyond reasonable doubt by full, explicit and satisfactory evidence.     p. 29

There must be due diligence in the application for such relief, and time runs from the time the mistake was discovered or by due diligence might have been discovered.     p. 30

In a suit by a subcontractor against the contractor to reform the subcontract by inserting a provision that the contractor should share any losses incurred by the subcontractor in doing the work, *held* that while the correspondence in evidence showed a difference of opinion between the parties as to the proper interpretation of the subcontract as regards such sharing of losses, it did not show that any provision in this regard was omitted by mistake.     pp. 31-35

A party who was so careless as to execute a contract for certain work, amounting to $68,000, without noticing the omission of a provision as to sharing such losses as might be incurred by him on the work, and so negligent as to fail for two years to discover the omission, while losses were being incurred, with the means of discovery at hand, is not in a position to ask reformation of the contract by reason of mistake in omitting such provision.     p. 34

*Decided June 25th, 1919.*

Appeal from the Circuit Court of Baltimore City (GORTER, J.).

The cause was argued before Boyd, C. J., Briscoe, Burke, Thomas, Pattison, Urner, Stockbridge, and Adkins, JJ.

*Frank Gosnell,* with whom were *Marbury, Gosnell & Williams* on the brief, for the appellant.

*Edward Duffy,* for the appellees.

Adkins, J., delivered the opinion of the Court.

The William Dall Company, the appellant, having a contract with the United States Government for the construction of an immigration station in Baltimore City, decided to give out a subcontract for "the stone work, ornamental terra cotta, structural terra cotta and gypsum or tile blocks in said immigration station," and obtained bids therefor, ranging from eighty-odd thousand dollars down to seventy-six thousand, which was the bid of the appellees. The amount to be paid the appellant for the construction of the station was two hundred and forty thousand dollars, of which the materials and work involved in the proposed subcontract was estimated by the appellant in their bid to the Government at sixty-eight thousand dollars.

The bid of the appellees for the subcontract was rejected, whereupon it was reduced to seventy-two thousand dollars, which reduced bid was also rejected; and after considerable negotiation the following written proposition was submitted by the appellees and accepted by the appellant, viz:

"Baltimore, Md., November 15, 1915.
"Messrs. Wm. Dall & Co.,
    "Washington, D. C.
"Gentlemen:               Re: Immigration Pier.
    "We propose to furnish all labor and materials, tools, appliances and scaffolding necessary to fully complete in every detail, according to the plans and specifications, all stone work, brick work, ornamental terra cotta and structural terra cotta and gypsum or tile

blocks, as described in the following portions of the specifications:

"Under the heading Stonework, paragraphs 252 to 261, incl., on pages 21 and 22.

"All work under the headings of brick work, ornamental terra cotta and gypsum blocks, as specified on pages 22 to 25, incl., except paragraphs 320, 321 and 322, which are not included, for the sum of sixty-eight thousand dollars ($68,000.00), agreeing to divide with you equally half and half the profits in the job.

"The actual cost of the work to be reckoned on a basis of the actual amount paid to mechanics and laborers actually employed on the work and the net amounts paid for materials used in the work.

"It is understood that no foreman, superintendents or clerks' salaries or office expense shall be included in the cost of the work.

"It is further agreed and understood that Wm. Dall & Co. will make advance, if required, to the extent of fifty per cent. (50%) of the pay rolls for labor. Payments to be made monthly to us for labor and material in accordance with the payments made by the U. S. Government on the work. Final payment to be made when the above work is completed and accepted by the Government.

"Yours very truly,
"(Signed)   Butcher & Williams,
"Witness:                    By David C. Butcher.
"(Signed) Warren Griffiss.
"Attest:
"(Signed) J. W. Fenton.
"Accepted:
"The William Dall Co.,
"(Signed) Joseph Dall, Vice-President.
"November 18th, 1915."

As the work under this subcontract neared completion in about two years, it was found that, instead of a profit, a loss of two thousand, six hundred and seventy-nine dollars and

eighty-four cents ($2,679.84) resulted, and on June 18th, 1918, after an ineffectual effort to induce the appellant to share this loss, the appellees filed their bill of complaint, in which they alleged, among other things, that the appellant approached the appellees with reference to taking the above mentioned subcontract; that their estimates differed as to the amount of material which it would take to do and complete the work; that appellees' estimate was larger than that of the appellant; that appellant insisted that its estimate was correct and that appellees' was too high; that appellees finally proposed that they would lower their estimate to $68,000.00, but, fearing a loss at that figure, notwithstanding the insistence of appellant that money could be made at that figure, also proposed that appellant should stand one-half of any loss that was sustained and should receive one-half of any profits that were made by appellees; that said proposition was accepted by appellant; that said proposition and understanding were oral in the first instance and were to be put in writing; that thereafter the contract above set out was drawn up; that by a mistake made by the draftsman of said contract it omitted to say anything about the appellant standing one-half of the loss, which omission was not noticed by appellees at the time, nor was the same noticed by them until at or about the time of the completion of the work covered by said contract. The bill further alleges that, after the execution of said contract, appellees entered upon the performance thereof and have completed the same at a loss of between twenty-five hundred ($2,500) and three thousand dollars ($3,000); that appellant has refused to stand any part of said loss, and that appellees are without adequate remedy at law, and are entitled to have said contract reformed in accordance with said oral agreement, and are entitled to receive from appellant one-half of any loss sustained by them in accordance with the terms of said oral agreement. The prayer of the bill is:

"(1) That the contract may be reformed so that by the terms thereof appellant shall be liable to appellees for one-half of any loss sustained by them in the job;

"(2) That after the reformation of said contract appellant may be required to pay appellees such sums of money as may be found to be due them under said contract as reformed;

"(3) For further relief."

The answer filed by appellant on September 19th, 1918, admits that it entered into said written contract, but denies the allegations as to mistake of the draftsman and as to the oral agreement to share losses; and avers that it never heard of any such claim until long after the completion of said contract by appellees; and that it was not until the bill of complaint was filed that plaintiffs ever pretended there was any agreement between the parties at any time concerning any loss that might arise or grow out of the transaction. To this answer the general replication was filed on October 1st, 1918; testimony was taken, and the Court below decreed that the contract be reformed by adding to said contract, after the words "Agreeing to divide with you equally half and half the profits of the job," the following words: "You to repay us half of any losses suffered by us on the job"; and that said addition should have the same force and effect as if originally written in said contract by the parties thereto, and, further, that appellant pay to appellees the sum of $1,339.92 and the costs of suit. From which decree an appeal was duly taken to this Court.

Before reviewing the testimony, it may be well to state the law applicable to this case. It is simple and undisputed.

Before a written contract can be reformed by a Court of Equity on the ground of mistake it must appear that the mistake was mutual. *Boulden* v. *Woods*, 96 Md. 332; *Hopkins* v. *Neal*, 128 Md. at page 256, and cases therein cited.

The mistake must be proved beyond a reasonable doubt. The evidence must be full, explicit and satisfactory. *Second*

*National Bank* v. *Wrightson,* 63 Md. 81; *Keedy* v. *Nally,* 63 Md. 311.

A mere preponderance of evidence is not sufficient. *Philippine Sugar Co.* v. *Philippine Islands,* 247 U. S. 385; *United States* v. *Budd,* 144 U. S. 154.

There must be due diligence in the application for relief, and time runs from the time the mistake was discovered or could have been discovered by due diligence. *Wood* v. *Patterson,* 4 Md. Ch. 335; *Hewitt's Appeal,* 55 Md. 509; *Hunt* v. *Stuart,* 53 Md. 225; *Keedy* v. *Nally,* 63 Md. 311; *Citizens Ins. Co.* v. *Conowingo Co.,* 116 Md. 422; *Stiles* v. *Willis,* 66 Md. 552.

Now, as to the proof:

There were five persons who took part in the negotiations leading up to the making of the contract, all of whom were witnesses, viz: Warren Griffiss, General Manager of the Baltimore Brick Company, the concern which furnished the bricks; David C. Butcher and Charles H. Williams, who composed the firm of Butcher & Williams, the appellees; H. C. Newman, Superintendent, and Joseph Dall, Vice-President of the William Dall Company, the appellant.

In addition to the facts above set out, the following facts were admitted, or at least not controverted, viz:

(*a*) That there was a difference of 130,000 between the estimate of appellees and appellant as to the number of bricks that would be required, and the actual number used was 100,000 in excess of appellant's estimate.

(*b*) That Newnam and Joseph Dall insisted there was a profit in the job of $8,000.00 at their estimate of $68,000.00. Griffiss testifies that Mr. Newnam was absolutely convinced his figures were all right and that there was a profit in it at $68,000.

(*c*) That appellees were willing to reduce their original bid because they had an "unusual amount" of scaffolding which they had acquired in connection with a previous job for the Bethlehem Steel Company.

(*d*) That the original draft of the contract was made by Griffiss on the day the agreement was reached, and that the contract as executed was an exact copy of this draft, and that it was prepared in the office of appellees and under their direction, and was at all times after its execution in the possession of appellees.

(*e*) That the first time appellees reported to appellant any loss in connection with the work was in November, 1917, when the work was almost completed, nearly two years after the date of the contract.

Now, as to the conflict in testimony, we have on one side Griffiss, Butcher and Williams testifying that the oral agreement was that Butcher & Williams would take the job at $68,000.00 and become partners in it with the Wm. Dall Co., sharing profits and losses.

On the other side we have Newnam and Joseph Dall testifying with equal positiveness that there was nothing said about losses or about partnership, and they are supported by the written memorandum made by Griffiss at the time.

It is proper to add that Griffiss's testimony is weakened by conflicting versions given by him of the alleged conversations. In his first recital of what occurred he says the proposition was to share *losses,* and it was only in response to a somewhat leading question that he added *"profits."* And it will be noted that both versions, given more than two years after the negotiations, are in conflict with the written memorandum made by him at the time the alleged conversations took place. So that regarding only the admitted or undisputed facts and the conflicting testimony above referred to, without the correspondence, which will be considered later, it would not be clear on which side the preponderance lay.

On the one hand, it could be plausibly argued that there is an inherent improbability in the contention that appellees, after starting with a bid of $76,000 and then by reason of special circumstances reducing their bid to $72,000, would not only propose to take the contract at $68,000.00, but also agree to share whatever profits there might be in the job.

On the other hand, it could be urged with equal force that the appellant, having made a bid of $240,000 for the entire contract, in which must have been included a satisfactory profit, would hardly have been willing not only to divide with appellees the profits of nearly one-third of the entire contract, but also, without any power to control the work, to take the risk of sharing losses with a firm whose estimates must have seemed to appellant unsatisfactory, and whose credit was so uncertain that Griffiss was unwilling (according to his testimony) to make a contract with them for the bricks on their sole responsibility. And so if there were nothing more in the case it would be at best a balancing of probabilities.

But there is something more in the case, namely, the correspondence. In their letter to appellees of November 23rd, 1917, appellant wrote:

"Mr. William Dall has explained to us that in your opinion we are obligated under the terms of our contract with you to bear one-half of the loss arising out of the performance of the work. We would like, to study this question more carefully, and we will set about to do so at once, all with a view of closing the account," etc.

Again on December 10, 1917, appellant wrote appellees:

"Referring to our letter to you of November 23rd, 1917, and to your letter and statement of November 27, 1917, in which you charge us with ½ of the loss on your work, amounting to $1,608.31, in addition to the amount due upon the contract and extra work. Our attorney advises us that under the terms of the contract this company is not liable for any losses you may sustain in the performance of the work. In his view you guaranteed that the work would be finished within the contract price."

And on December 15, 1917, appellees wrote appellant:

"In response to yours of the 10th inst. beg to advise that we entered into this contract with you by ignoring

our figures and accepting yours as a basis of the cost of the job. After accepting your figures we proceeded with the contract, pushed the work energetically, and on completion find that there is a loss of $3,216.62, which is due to the fact that your quantities were incorrect, the following quantities being in excess of the quantities that you gave us to base our estimates upon:

| | | |
|---|---|---|
| 88,000 Red face brick at $32.00 | ...... | $2,816.00 |
| 107,000 White brick at $45.00 | ........ | 4,815.00 |
| | | $7,631.00 |
| Credit 100,000 Common brick at $17.00 | . | 1,700.00 |
| | | $5,931.00 |

"The above quantities are in excess of the quantities you gave us, and we have arrived at same from the actual deliveries. This shows on the surface that we are not responsible for any loss, but as we are a party to the contract we thought that the very smallest thing you could do is to stand ½ the loss, which is our interpretation of contract," etc.

On December 18, 1917, appellant wrote appellees:

"We have your letter of 13th inst., and beg to advise you that there will be a meeting of the Board of Directors of the Company on Dec. 24th, at which time your claim of facts that you believe should alter the construction of the contract will be considered. In the meantime you might tell us definitely who on behalf of the Company undertook to guarantee to you quantities involved in the work."

On December 20th, 1917, appellees wrote appellant:

"Relative to quantities of brick in the job, wish to advise that Mr. W. C. Newnam in the presence of Mr. Joseph Dall and others present gave the writer a memorandum of the quantities in the job stating that same would complete the work."

On December 31, 1917, appellant wrote appellees:

"Referring to our letter of December 18th and your answer to same of Dec. 20th, 1917. The Board of Directors of the Company has taken the story of Mr. Joseph Dall and Mr. K. C. Newnam upon your claim that they misrepresented brick quantities to you. In the light of their story we are still advised by our attorney that under the contract this Company is not liable for any part of the losses you may have sustained."

It will be noted that throughout this correspondence there is not one expression or word to indicate that any of the parties to it knew or had heard of an omission by the draftsman in the memorandum, or by the appellees in preparing the contract, of any part of the oral agreement.

It is inconceivable that Griffiss, who reduced the oral agreement to writing, should have turned over to the appellees, who were parties to it, this important paper involving $68,-000.00, without reading it over, and that appellees on receiving the memorandum were so indifferent to their own interests as to have it copied without careful examination of its contents, and that they did not even take the trouble to compare the contract with the memorandum before executing it. It is still more difficult to believe that during all those two years, while losses were being incurred, and especially during the months of November and December, 1917, when the controversy was going on about the proper construction of the contract, they did not know its contents. At any rate if they were careless enough to execute so important a contract without knowing its contents, and so negligent as to fail to discover the alleged mistake during the two years while the losses were being incurred, with the means of discovery at hand, they are not in a good position to ask relief from a Court of Equity in a matter involving the exercise of a power which should be used with the greatest caution. A careful examination of the correspondence, especially appellees' letter of December 15th, leads one to the conclusion that

the claim of the appellees at that time was based, not on a supposed error in omitting part of the oral agreement from the written contract, but on a misconstruction of the agreement itself.  Apparently it was the opinion of appellees that an agreement to share profits made the parties to the contract partners both as to profits and losses.  But it does not by any means follow that appellant so understood it.

The letter of December 15th also makes it clear that appellees regarded the representation of appellant, as to quantity of bricks required, as a guaranty, and thought appellant should bear the loss.  They say distinctly that "we entered into this contract with you by ignoring our figures and accepting yours as a basis of the cost of the job" * * *  This shows on the surface that we are not responsible *for any loss,* but as we are a party to the contract we thought that the very smallest thing you could do is to stand ½ the loss, *which is our interpretation of the contract."*  What contract?  Why, of course, the written contract, the only one that has been referred to in the correspondence and which presumably the writer of the letter had before him when referring to his interpretations of it.

In view of the principles governing Courts of Equity in dealing with cases of this character, as set out in the beginning of this opinion, we are forced to the conclusion that the Court below erred in granting the relief prayed for by the bill, and that the decree appealed from must be reversed.

> *Decree reversed and bill dismissed, with costs to appellant.*

Urner, J., dissented.