RICHARD C. BROCKMEYER *v.* CAMSADEL C. NORRIS ET AL., EXECUTRICES

[No. 63, October Term, 1939.]

*Decided January 11th, 1940.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*William F. Podlich* and *William J. McWilliams,* for the appellant.

*John R. Norris* and *J. Oliver Clark,* for the appellees.

MITCHELL, J., delivered the opinion of the Court.

The appeal in this case is from a decree of the Circuit Court for Anne Arundel County, dismissing the bill of complaint filed by the appellant, seeking reformation of a written agreement for the sale of a sub-division of land and the specific performance of the agreement as modified; which decree embodied therein an award to the appellees for specific performance, requiring the appellant to consummate the purchase of said land in conformity with the terms of the agreement, as construed by the chancellor.

In substance the bill alleges that on April 18th, 1938, James S. Robinson, Jr., executed an agreement in writing whereby he leased to Richard C. Brockmeyer, the appellant, certain land described therein, and embracing an option to the lessee to purchase the demised premises within a specified period.

On May 10th, 1938, the appellant duly exercised said option by written notice to the lessor, who received said notice on the following day. Mr. Robinson died on May 12th, 1938, and the executrices under his last will and testament are accordingly parties to this suit in his stead.

It appears from the record that Robinson formerly was seised and possessed of a sub-division of land substantially bounded on the north by a county road; on the east in part by the Ritchie Highway and in part by the Baltimore and Annapolis Boulevard; on the south by the land of Charles L. Allen, which the latter had acquired from Robinson in 1931, and on the west by the right of way line of the Baltimore and Annapolis Railroad. The entire tract, as shown by "Defendant's Exhibit B" and, as thus bounded, originally contained 23.43 acres, but, prior to the execution of said agreement, it is shown that the owner had conveyed a small part thereof, containing approximately six-tenths of an acre located adjacent to the Ritchie Highway, to the State Roads Commission of Maryland; the area of the land between the above indicated and well defined boundaries, actually owned by Robinson at the time of the agreement, being 22.83 acres.

The description, in the agreement, of the land leased to the plaintiff with the option to buy, fixes the place of beginning as being the point of the intersection of the south side of the above county road with the west side of the Ritchie Highway; running thence in a westerly direction along the south side of the county road 1145 feet, more or less, to the line of the right of way of the Baltimore and Annapolis Railroad; thence southeasterly along the right of way line of said railroad 750 feet; thence northeasterly 850 feet, more or less, to a point on the Annapolis Boulevard 430 feet southerly from its intersection with the west side of the Ritchie Highway; thence northerly along the west side of the Annapolis Boulevard 430 feet to its intersection with said Ritchie Highway, and thence along the west side of said latter highway 370 feet, more or less, to the place of beginning, containing 17.8 acres of land, more or less.

470

There is no controversy as to the circumstances connected with the preparation and execution of the agreement. The same was drafted by the attorney for the appellant and the calls and distances were reached from an alleged plat which the appellant delivered to his said attorney for the purpose of the descriptive part of the agreement. The latter was drafted in the attorney's office in Baltimore City, out of the presence of Mr. Robinson, who at that time was indisposed and confined to his home. According to the testimony of the attorney, however, on the same day on which he prepared the agreement, accompanied by the appellant he visited the home of Mr. Robinson, and in the presence of the parties to the agreement verified the description used therein by comparing the same with a plat which, at the instance of Robinson, he secured from a desk in the latter's room. The witness could not definitely identify a plat, or a blue print thereof, submitted to him in the course of his examination, as being the same plat which was used in verifying the description embraced in the agreement with Mr. Robinson; but the gist of his testimony is that Robinson then referred to the fact that he had conveyed, from his original holdings, a lot to one Allen, which lot, according to plats filed as exhibits in the case, extends along the southern boundary of the remaining Robinson land, and is bounded on the west by the railroad right of way and on the east by the Baltimore and Annapolis Boulevard. What is designated in the record as "Complainant's Exhibit No. 1," purporting to be a plat made by one "Disney" in February, 1920, the witness asserted was similar to the plat by which the verification were made, and he further testified that it was the purpose of both parties to the agreement and option, and his own objective in drawing the same, to embrace therein all of the land then belonging to Robinson, lying between the county road on the north, the Allen land on the south, the Baltimore and Annapolis Boulevard and the Ritchie Highway on the east, and the Baltimore and Annapolis railroad on the west. No course or distance is shown on

the "Disney" plat, along the line of the railroad, but upon that plat a scale of 200 feet to the inch is given, and by that scale the attorney testified he computed the distance between the county road and the Allen land, along the line of the railroad, to be 750 feet, and embraced that distance in the agreement. That distance, however, as established by recent surveys made at the instance of the respective parties to the suit, ranges from 998.25 feet according to a plat filed as an exhibit by the appellees, to that of 1006 feet according to a plat filed as an exhibit by the appellant.

Accordingly, the land in controversy embraces a strip, containing 4.06 acres, which marks the northern boundary of the Allen property and extends from the railroad right of way on the west to the Baltimore and Annapolis Boulevard on the east or southeast, and it is the contention of the appellant that its exclusion from the operation of the terms of the agreement was solely due to a mistake concurred in by both parties to the agreement, and induced by an inaccuracy in the scale noted on the "Disney" plat.

It is obvious that the alleged mutual mistake would have been readily avoided had the description embraced in the agreement omitted the element of distance along the line of the railroad, and the north line of the Allen property been designated as the southern boundary line of the property designed to be embodied in the agreement. And that omission is explained by the draftsman of the agreement in his testimony with reference to its preparation as follows:

"Q. This paper which is already identified as 'Exhibit No. 2,' (referring to a plat similar to the one originally furnished the attorney by his client), does not have any mention on it of Allen's land? A. No it does not. Q. Nor of Allen's line? A. No it does not. Which is probably the reason I did not make the call in the description 'to Allen's line,' because I did not know of Allen's lot at that time, until I got up to Mr. Robinson's house. * * *

Q. Was any statement made by Robinson to you with

regard to selling the land all the way to Allen's land? Did he actually mention that the lot of Brockmeyer which was being sold would extend to the northern extremity of the Allen land? A. I don't think it was said in so many words, but we all seemed to just understand it and just took for granted it was that way, and I am convinced that Mr. Robinson understood it that way. I did, and I am thoroughly convinced Mr. Robinson did and I know Mr. Brockmeyer did."

Reduced to its final terms, therefore, the prayer that the written agreement set forth in the bill of complaint be reformed so that the alleged mutual mistake referred to therein may be corrected, and the agreement as so reformed specifically enforced, is based upon speculative, rather than affirmative, testimony. Furthermore, when it is recalled that the only testimony, bearing upon the incidents immediately connected with the execution of the agreement by Mr. Robinson, emanates from the attorney of the appellant, and must be considered without elucidation which the testimony of Mr. Robinson, if living, might reflect upon the facts and circumstances surrounding the execution of the agreement, it is obvious that the case is one which invites the most careful consideration of the chancellor, notwithstanding this observation is made without the slightest reflection upon the intergrity of the attorney who conducted the transaction involved.

The general principles applicable to proceedings for the rescission or reformation of contracts are so fixed as to give rise to but little controversy, and in 5 *Pomeroy's Equity Juris.*, (2nd Ed.), sec. 2096, they are summarized as follows: Reformation is appropriate in cases of mutual mistake—that is, when an agreement has been made, or a transaction has been entered into or determined upon, as intended by all the parties interested, but in reducing such agreement or transaction to writing, through the mistake common to both parties, the written instrument fails to express the real agreement or transaction. In such a case the instrument may be corrected

so that it shall truly represent the agreement or transaction actually made or determined upon according to the real purpose and intention of the parties. It is to be observed that the mistake which is the ground for this relief must be in reducing the contract to writing. 'In every case, it must clearly and satisfactorily appear that the precise terms of the contract had been orally agreed upon, and that the writing afterwards signed fails to be, as it was intended, an execution of such previous agreement, but, on the contrary, expresses a different contract.' A court of equity will not make a contract for the parties. The mistake may be either as to the contents or the effect of the instrument; but the mistake of both parties must be in regard to the same matter." And in section 859 of the same authority, volume 2, pages 1756 and 1757, it is said: "The authorities all require that the parol evidence of the mistake and of the alleged modification must be most clear and convincing—in the language of some judges, 'the strongest possible'—or else the mistake must be admitted by the opposite party; the resulting proof must be established beyond a reasonable doubt. Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of evidence, but only upon a certainty of the error." See *Miller's Equity Proc.,* sec. 669; 53 *C. J.* secs. 59 and 60; 23 *R. C. L. pages* 327 and 328; *Wood v. Patterson et al.,* 4 Md. Ch. 335; *Keedy v. Nally,* 63 Md. 311; *England v. Gardiner,* 154 Md. 510, 142 A. 625; *Farmville Ins. & Banking Co. v. Butler,* 55 Md. 233, 238.

It cannot be doubted, therefore, that a court of equity has ample powers to correct and reform an instrument and make it conform to the intention of the parties, if by mutual mistake it fails to express their real intentions, or contains terms or stipulations contrary to their common intention, provided the evidence be of a character to justify such action of the court. But, as said in *Dulany v. Rogers,* 50 Md. 524, 533: "It is incumbent, however, upon the party seeking to reform a written instrument to show by conclusive proof, that it does not embody the

final intention of the parties; courts will not rectify it unless it was executed under a common mistake—both parties having done that which neither of them intended. A mistake on one side may be ground for rescinding, but not for reforming a written agreement." See *Gaver v. Gaver,* 119 Md. 634, 87 A. 396; *Hesson v. Hesson,* 121 Md. 626, 89 A. 107; *Dall Company v. Butcher,* 135 Md. 25, 107 A. 527.

Along the same line of reasoning, in *Second Nat. Bank v. Wrightson,* 63 Md. 81 it is stated that: "Before a court of equity will undertake the difficult and delicate task of reforming an agreement in writing, it must be satisfied beyond a reasonable doubt by the proof, that the agreement so sought to be reformed, was not the agreement that the parties intended, and wished to make, and it must be equally well satisfied what was the agreement contemplated at the time of the execution of the writing. The evidence on these points must be full, explicit and satisfactory, before a court of equity will interfere." The degree of proof required is such full and strict evidence as will be sufficient to satisfy the mind of the court. *Coale v. Merryman,* 35 Md. 382; *Showman v. Miller,* 6 Md. 479, 485; *Coggins & Owens v. Carey,* 106 Md. 204, 66 A. 673. In brief, it is not enough to show the intention of one of the parties to the agreement only, but the proof must establish beyond peradventure that the error or mistake alleged was common to both parties to the same. And "where each party is equally innocent and there is no concealment of facts which the other party has a right to know, and no surprise or imposition exists, the mistake or ignorance, whether mutual or unilateral, is treated as laying no foundation for equitable interference." *Story's Eq. Juris.* sec. 151; *Cohen v. Numsen,* 104 Md. 676, 65 A. 432.

Applying, therefore, the general principles enunciated by the cited authorities to the facts in the instant case, and bearing in mind that the element of fraud on the part of either party to the agreement is entirely wanting, the question which confronts us is whether the facts

revealed by the record before us warrant the relief prayed. As has been noted, death has eliminated from consideration any testimony on behalf of the appellees bearing upon the negotiations which took place at the home of Mr. Robinson, immediately preceeding the execution of the agreement.

The attorney who drafted the agreement did not retain the plat originally left with him by the appellant for that purpose. His testimony is to the effect that "Plaintiff's Exhibit No. 2," as found in the record, is similar to the plat originally handed him by the appellant, except that it does not show what does appear by said exhibit, namely a line cutting off the triangle which was sold to the State Roads Commission from the land as described in the agreement, as established by the whole testimony found in the record. On that plat the Allen land is not shown as such, but the land conveyed to the State Roads Commission, hereinafter designated as an "apron," and contiguous to the Ritchie Highway, is indicated by a line drawn across a small corner of the land as described in the agreement, from a point on said highway to the Baltimore and Annapolis Boulevard; and it appears that the same distances found on said exhibit are embraced, respectively, in the agreement, without reference to the cut off line, thereby including the "apron" in the description.

"Plaintiff's Exhibit No. 1" was identified by the above witness as being practically similar to the plat by which he testified the agreement was verified with Mr. Robinson, and which he obtained from the latter's desk. He also testified that at the time of the verification no reference appeared on the latter plat indicating either the Allen land or the "apron." In other words, it is not definitely shown that Robinson intended to lease all of the land in the particular tract involved between the county road on the north and the Allen land on the south, and it is shown that he could not have leased the area covered by the "apron," because he did not, at the time he executed the agreement, own the latter area.

The testimony also tends to show that Robinson was a careful business man; that he held title to other subdivisions of land in the immediate locality of the land contemplated to be embraced in the agreement; and the distance along the line of the railroad establishing the west boundary line of the land described in the agreement is definitely stated to be 750 feet, and is not qualified by the words "more or less." These circumstnces tend to detract from the weight of the appellant's testimony, but, in addition to them, it is shown that under the construction of the contract as submitted by the appellees, after deducting from the area, embraced in the latters' version of the agreement, the area previously conveyed to the State Roads Commission, an area of 18.77 acres remains subject to conveyance to the appellant, whereas the agreement as drawn called for an acreage of 17.80, more or less. The authorities agree that to justify the interposition of a court of equity in effecting the reformation of an instrument due to a mutual mistake on the part of the parties thereto, the mistake must be material, that is, one which will substantially affect the rights and obligations of the parties to the instrument.

In 23 R. C. L. p. 321, it is said: "If a mistake is made in reference to some fact which, although connected with the transaction, is merely incidental and not a part of the very subject matter or essential to any of its terms, or if the complaining party fails to show that his conduct was in reality determined by it, in either case the mistake will not be ground for any relief, affirmative or defensive." It must have controlled the conduct of the complainant, so that but for the mistake he would not have made the obligation from which he seeks relief. 53 C. J. p. 929. And there is nothing in the testimony in the record before us to indicate such a situation.

The case was heard upon bill, answer and the testimony submitted, and, as indicated, the decree dismisses the bill of complaint, with costs to the appellees, and re-

quires the specific performance of the agreement to the end that the appellant be required to comply with the same as construed by the chancellor.

Ordinarily, an answer is a defensive pleading, and if the defendant seeks affirmative relief, germane to the suit, against the plaintiff, he must file a cross-bill. One of the principal exceptions to the rule, however, is in cases of specific performance. *Miller's Eq. Proc.*, sec. 191, *Phelps' Jurid. Eq.* sec. 67. We are therefore in accord with the conclusion of the chancellor that under the pleadings the written agreement involved in the case may be decreed to be specifically performed, as, in our opinion, the land which the appellant leased, and which he has exercised his option to purchase, is described with that degree of reasonable certainty which warrants such a decree. *Loughran v. Ramsburg,* 174 Md. 181, 197 A. 804; *Powell v. Moody,* 153 Md. 62, 137 A. 477, 478. In the latter case it was said: "The description must be such as to enable the court to determine with certainty, with the aid of such extrinsic evidence as is admissible under the rules of evidence, what property was intended by the parties to be covered thereby. The description need not be given with such particularity as to make a resort to extrinsic evidence unnecessary. Reasonable certainty is all that is required." It is true that the decree appealed from excludes the land, which prior to the date of the agreement had been conveyed by Robinson to the State Roads Commission, from its operation and effect; but the exception was doubtless embodied in the decree for the purposes of clarification, and not because such an exception was essentially necessary. All that Robinson could have possibly leased or agreed to sell along the eastern boundary of his land was to the western lines of the two highways called for in the agreement, and that, in effect, is what the decree for specific performance directs to be conveyed to the appellant, upon compliance on his part with the conditions of the decree. Under the decree, as has been seen, the acreage to be conveyed to him will be slightly more than that contemplated by the agreement.

478

But, assuming that under the description with reference to the above two highways, as recited in the agreement, the area, designated in the testimony as an "apron" to the Ritchie Highway, was covered by the agreement in question, the case does not present a state of facts in which the area which the decree excludes is so located as to materially affect the use, enjoyment, and marketability of the rest of the property covered by the agreement. Nor does it present a situation in which the appellant would be entitled to a proportionate abatement of the purchase money. *Suburban Garden Farm Homes Corp. v. Adams*, 171 Md. 212, 188 A. 808.

For the reasons stated the decree will be affirmed.

*Decree affirmed, with costs to the appellees.*