293 So.2d 139 (1974)
SOUTHEASTERN FIDELITY INSURANCE COMPANY, Appellant,
v.
Melton BROUGHTON, Appellee.
No. S-385.
District Court of Appeal of Florida, First District.
April 23, 1974.
James M. Weber, of Beggs, Lane, Daniel, Gaines & Davis, Pensacola, for appellant.
No appearance for appellee.
HOWELL, CHARLES COOK, Jr., Associate Judge.
This is not a reproduction of Charles Dickens' immortal "Tale of Two Cities."
This is a reproduction of Mr. Melton Broughton's (he was the plaintiff below and is the appellee here) "Tale of Two Houses"; in both of which he had an interest; on one of which there was a policy of fire insurance written by Southeastern Fidelity Insurance Company (the defendant below, the appellant here) and on the other of which, the one that burned, there was no such policy.
House No. 1: This was the one at 512 Washington Street in Cantonment, Escambia County, Florida; rented by Broughton as a tenant at the time he arranged for one William Bell of the Home Company, an individual engaged in the business of moving houses, to move for him the dwelling described in the next paragraph. 512 Washington Street was a duplex; of concrete block construction; and, according to the independent insurance adjuster, J.F. Smith, it had been "built right on the site" and "had not been moved" there. Southeastern wrote the policy for "Melton Broughton, 512 Washington Street, Post Office Box 236, Cantonment, Florida" in the face amount of $2,500.00 for which, the structure being in Class 8, Zone 3, territory, a $58.00 premium plus a $5.00 inspection fee, or a total of $63.00 premium, had been charged.
*140 House No. 2: This was the one located on the south side of Hicks Street in Cantonment; was owned and lived in by Broughton at fire time; was a single family dwelling of frame construction; green in color; and located between a quarter of a mile and a half mile from the home Broughton had been renting at 512 Washington Street. This Hicks Street house was in Class 10, Zone 3, territory; and $2,500.00 fire coverage for it would have cost $70.00, plus a $5.00 inspection fee, or a total premium of $75.00. This was the house destroyed, on January 31, 1971, by the fire.
After that tragic incident Broughton made claim for the proceeds of the policy against Southeastern, which promptly denied the claim, upon which Broughton as promptly brought a suit via the medium of reformation in the Court of Record of Escambia County, Florida. He there prevailed in a partial final judgment rendered after final hearing, reforming the policy to read "to cover property commonly known as `South side of Hicks Street, Cantonment, Florida', instead of 512 Washington Street, P.O. Box 236, Cantonment, Florida."
From said judgment Southeastern has appealed and, on the appeal, we find the judgment erroneous even though our Court, too, as wrote the Third District Court of Appeal in Sponholtz v. Sponholtz, 1965, 180 So.2d 497, 500, "will not lightly set aside the findings of the chancellor on the facts where the evidence is heard by him and the witnesses are before him unless shown to be clearly erroneous; yet where a decree is manifestly against the weight of the evidence, or contrary to, and unsupported by the legal effect of the evidence, then it becomes our duty to reverse such decree."
With deference we are persuaded that this "decree is manifestly against the weight of the evidence" and "contrary to, and unsupported by the legal effect of the evidence," because the record wholly fails, for the reasons now to be stated, to support the material allegations of the complaint that "it was the intention of plaintiff and defendant that said policy of insurance would cover plaintiff for losses occasioned and suffered by him through loss of plaintiff's property described herein." (e.s.) This is a charge of mutual mistake[1] as affording the predicate for the reformation suit, since there was again a dearth of evidence on an alternative allegation of the complaint of "fraud on the part of defendant that the policy of insurance did not correctly describe the loss herein."
When is a mistake "mutual?"
Our Supreme Court answered the question in Blumberg et al., v. American Fire and Casualty Co. et al., Fla., 1951, 51 So.2d 182, 184, when it explained that "there are conditions that determine when a mistake is mutual. There is no suggestion of fraud here. A mistake is mutual when it is shown that the parties agreed on one thing and when they put it in the contract they said something different." (e.s.)
These parties never "agreed on one thing." How can one "agree" as to something of which he is totally ignorant? Southeastern never knew, before or at the time the policy contract was written, that there was a house owned by Broughton, on *141 the south side of Hicks Street. Without that essential knowledge Southeastern couldn't possibly have "agreed" with Broughton to insure it.
Certainly no information about the Hicks Street house had ever been imparted to Southeastern in the application overtures preceding the actual writing of the policy. Those overtures had been conducted by Broughton's own agent,[2] with Conway-Spence Insurance Agency representing Southeastern. Wishing to stop renting at 512 Washington Street and acquire a home of his own on the south side of Hicks Street, and after having arranged with Bell to handle the moving, Broughton was told by Goldsmith, in Bell's office "who was going to be handling the insurance I called the insurance and asked the lady how  well, I called there to ask somebody who was responsible for the insurance and to see how my insurance was set up since I couldn't buy it myself and they were going to handle it, whoever holds the mortgage, they were going to have to be responsible for the insurance, I couldn't get it until  I had to keep it for at least 3 years, that is the way they had it drawed up ... ... I assume the mortgage company (actually applied for the insurance policy for him) ... whoever holds the mortgage because they were the ones that were going to have to be the loser in the case, that is the way I see it."
Kindly note, please, that there was nothing in the foregoing to red flag for Southeastern that Southeastern was to insure a frame dwelling on the south side of Hicks Street, or that Broughton owned that lot or that Broughton was having a frame building he intended to live in moved to the site!
Nothing, either, was told Southeastern, or Cecil Hartley, or anyone else connected with Conway-Spence or Southeastern about the house on the south side of Hicks Street in any of the later pre-policy negotiations. Broughton did subsequently call a female clerk in Conway-Spence's office "to find out what type of insurance I had, you know, and how it was going to benefit me if I got my furniture and stuff, you know, and see how it was going to work. I mostly wanted to see if it was going to pay my furniture off, you know, if something happened to my furniture." When asked, "What transpired during the course of your conversation with the lady about where you were living and what the address of the property was?", Broughton replied only, "Well, she didn't go too much into it because she was just the secretary. I didn't get a chance to talk to Mr. Hartley about it until later." Prior to the policy issuance Broughton simply, and with utter vagueness, ambiguity, and lack of specificity, "told" Mrs. Eula Mae Stewart, secretary for Conway-Spence, "I owned the house[3] and did she have a file on some insurance for me, that is all I asked." The idea or mental intent that the insurance was to be placed upon a house Broughton was moving to Hicks Street was never "brought up as to whether it was to be moved or not moved. All we (i.e. Conway-Spence, for Southeastern) were asked was could we insure the houses and which *142 we insured the houses at the locations he gave us."[4]
Mrs. Stewart clearly remembered that the only here relevant address given her was 512 Washington Street, since she affirmatively wrote that address down at the time, and produced the records to prove it. She persisted in her conviction that she made no mistake about the Washington Street house or its address because she "repeated each one of them", i.e., the 25 addresses. "I repeated each address to the girl to make sure I had them right." And all Mrs. Stewart took over the phone from the Bell office was "Melton Broughton, 512 Washington Street, mailing address Post Office Box 236, Cantonment, Florida, retired ... That is all ... That is all the information she gave" her.[5]
Thus the case seems to be factually governed[6] by Dixie Fire Ins. Co. v. Wallace, *143 1913, 153 Ky. 677, 156 S.W. 140, 141-142. There T.Q. Wallace owned a one story house on the south side of the Louisville & Atlantic Railroad track in Estill County, Kentucky. He also owned a cottage on the north side of the same track, hard by the one story home just identified. The cottage on the north side of the railroad track was occupied by Wallace's tenant, but Wallace later sold the cottage on the south side of the track to a man named Collins. Then it was that he applied to a certain Smith, Dixie Fire's agent, for a fire insurance policy covering Wallace's cottage situated "on the railroad"; directing Smith to go out and inspect the house  although he failed to tell Smith that he did not own any house on the south side of the railroad track. Smith, for his part, confessing that he did not ask Wallace which side of the track the house to be insured was on, explained that he thought he knew! Smith did, however, examine for Dixie Fire Insurance, which issued its policy covering, the cottage on the south side of the track and, as ill luck would so capriciously have it, the home on the north side of the track was to become wholly destroyed by fire. Wallace, in the ensuing action against Dixie Fire, was met by the latter's denial that it had ever insured Wallace's house on the north side of the railroad track, or that it had ever intended to insure that house; and although Wallace prevailed at the trial level the case was set aright on the appeal for the reasons, the court explained,
"This is not a case where the parties intended and attempted to insure a certain building, which was mislocated by a mistake of the draftsman of the policy. Cases of that character are of easy solution, since the minds of the parties to the transaction agreed upon the contract, which could not be defeated by the failure of one of the parties to properly express it. In the case at bar, however, the minds of Wallace and Smith never met upon a common ground, since Wallace applied for insurance upon a house on the north side of the railroad, while Smith insured a house on the south side of the railroad, after an examination of the premises. One of the essential elements of a contract, if not the most essential element, is the requirement that there must be an agreement between the parties. An agreement is the expression by two or more persons of a common intention to affect their legal relations; it consists in their being of the same mind and intention concerning the matter agreed upon. 9 Cyc. 244. But here the parties never agreed upon the subject of the contract. It is apparent, therefore, without any extended discussion,[7] that Wallace and Smith were never of the same mind and intention concerning the *144 house which was to be insured, and for that reason there was no contract between Wallace and the appellant. The policy, as written, accurately expressed Smith's understanding of the contract, and did not insure the house that was burned."
The instant "policy, as written, accurately expressed" Southeastern's "understanding of the contract, and did not insure the house that was burned", since to so read the contract of insurance between Broughton and Southeastern would require a violation of the rule that "courts have no power to make contracts for parties, or to rewrite, alter, or change contracts when made, ..." Wilcox et ux. v. Atkins, Fla.App.2nd, 1968, 213 So.2d 879, 881  and, especially, our own opinion in Florida East Coast Railway Company v. Atlantic Coast Line Railroad Co. et al., Fla.App.1st, 1966, 193 So.2d 666, 668, observing that "neither the chancellor nor this court has the authority to rewrite that agreement." The principle is applicable to reformation suits; as witness the case of Brockmeyer v. Norris et al., 1940, 177 Md. 466, 10 A.2d 326, 329: "A court of equity will not make a contract for the parties. The mistake may be either as to the contents or the effect of the instrument; but the mistake of both parties must be in regard to the same matter."
Therefore, "because it appears from the undisputed facts that there was no mutual mistake ... involved ...," Schlehuber v. Norfolk & Dedham Mutual Fire Insurance Company, Fla.App.3rd, 1973, 281 So.2d 373, 375, this case must be reversed with deferential directions to the chancellor below to vacate the December 21, 1972, "Partial Final Judgment" and to instead enter a final judgment for defendant.[8]
It is so ordered.
RAWLS, C.J., and JOHNSON, J., concur.
NOTES
[1] Unless the mistake is mutual, the situation evokes, legally, the same response as a mistake, theologically  if Thomas Henry Huxley is to be credited in one of his "Lay Sermons":

"The chess-board is the world, the pieces are the phenomena of the universe, the rules of the game are what we call the laws of Nature. The player on the other side is hidden from us. We know that his play is always fair, just and patient. But also we know, to our cost, that he never overlooks a mistake, or makes the smallest allowance for ignorance."
[2] Broughton told the adjuster that he had bought a frame house from the Home Company and the Home Company was owned by William Bell, whom plaintiff employed to have the house, which ultimately burned, moved to the Hicks Street site. When queried with respect to a certain Goldsmith with whom Broughton had some preliminary discussions, "He does not work for Conway-Spence, does he?", the reply came back, "He sure don't." Cecil Hartley, office manager of Conway-Spence Insurance Agency, testified that it was Bell who placed the application for the insurance for some 25 houses (and each was identified and particularized, as hereinafter noted) located "all over Escambia County."
[3] Which house? The words "Renting here" were written on the face of the policy, across from the typed Washington Street address, only after the loss occurred!
[4] Southeastern knew absolutely nothing about any "location" at all of a house on the south side of Hicks Street until after the fire. Quite to the contrary, Mrs. Stewart emphatically replied in the negative when asked, "is there any reference in your file whatsoever  was there any reference in your file whatsoever prior to the loss, any reference to property located on the south side of Hicks Street?" It was never the intention of Conway-Spence to insure any one of the 25 houses "regardless of where the house was!"
[5] The only naked testimony in the record supporting Broughton's philosophy that Conway-Spence had known precisely that Broughton was requesting coverage for the Hicks Street frame structure, was Broughton's own remarks that it was "the understanding of all parties concerned that the house to be insured was the house that was going to be moved onto the property;" that he "discussed this with Mr. Hartley."

In the first place, Broughton himself couldn't possibly have known what "the understanding of all parties concerned" was, since he had replied, "No, I didn't," to the question, "Now, did you personally apply to Conway-Spence for insurance on this property?"
In the second place, this is a pure conclusion; and the law is clear that "such an item of evidence ... is entitled to no more probative value than it would have had if it had been admissible under established rules of practice ... ... Evidence does not have weight, because it is admitted; ... ... Whether, as a matter of law, incompetent evidence admitted without objection is entitled to be considered ... is one question; whether, in fact, it has any probative value is another. The conclusion of a witness who has no personal knowledge of the facts is of no probative value." Caudill, Administratrix, v. Nationwide Mutual Insurance Company of Columbus, Ohio, 1965, 264 N.C. 674, 142 S.E.2d 616, 621.
In the third place, what was the matter that Broughton "discussed... with Mr. Hartley?" He acknowledged that it was merely "just a matter of finding out what type of insurance I had and she (sic) couldn't explain too much about it, so I went on and waited for the policy to get to me and later on I did get one" which he "just tucked ... away for safekeeping. I just seen how much the value was and that was it." In the fourth place, all the evidence on this particular facet, taken as a whole, does not satisfy the rule that "the burden of proof is greater" in reformation proceedings "than in the usual civil case in that more than a preponderance of the evidence is required. The proof need not be beyond a reasonable doubt, but it `must be clear and convincing, and sufficient to overcome the strong presumption arising from the (contract) that it correctly expresses the intention of the parties.'" Sobel v. Lobel. Fla.App.3rd, 1964, 168 So.2d 195, 197. Chiming in on the same chord is Insurance Company of North America v. Ours and Pruitt, Fla.App.4th, 1972, 266 So.2d 168, 170.
[6] No authority, either factual or legal, has been cited to us by the attorney representing Mr. Broughton below. That attorney strangely disregarded the admonitions of our Supreme Court, of this Court, and of our sister District Courts of Appeal. "The appellee has not favored us with a brief and we do not have the benefit of its contentions in this matter. Briefs of the parties are of great assistance to this Court. If such were not true there would be no cause for allowing them to be filed. Failure to file a brief frequently reacts to the detriment of a party." Griffith v. Shamrock Village, Inc., Fla., 1957, 94 So.2d 854, 858. "We take note of the fact that appellees have not furnished this court with a brief. It does not appear that this counsel of record have been discharged or that they have made any showing for failure to submit a brief. Attention is invited to the fact that such neglect imposes an inordinate burden on the appellate court and is not conducive to the best interest of the client. Briefs on appeal are expected to be furnished by the attorney for appellee in the lower court, no matter how simple the issues may appear. If any cause exists for not preparing the brief, it should be seasonably reported to this court and counsel excused." Jacksonville Tractor Company v. Nasworthy et ux., Fla.App.1st, 1959, 114 So.2d 463, 465. "... counsel will be well advised to perform that service to their clients and the appellate court. The trial judge is also entitled, as a matter of courtesy, if for no other reason, to have the active support of his rulings by those who, it must be assumed, influenced the result at the trial level." Trumbull Chevrolet Sales Co., Inc., v. Motor Vehicle Commissioner et al., Fla.App.1st, 1961, 134 So.2d 40, 41-42. Accord: Loving v. Viecelli et al., Fla.App.3rd, 1964, 164 So.2d 560, 561; In re Estate of Krugle, Fla.App.2nd, 1961, 134 So.2d 860, 861; and Tanner v. Tanner, Fla.App.2nd, 1967, 194 So.2d 702, 703.

Notwithstanding the regretted dereliction of his counsel, we hasten to assure Mr. Broughton, and the trial judge as well, that we have spared no effort in searching the record and the law in quest of evidence and decisions calling for an affirmance of the judgment appealed from.
[7] Which, if the reader has the time and inclination, unfolds in Reeves v. Thompson, 1932, 225 Ala. 204, 142 So. 663; Zurich Insurance Company v. Bass, Tex.Civ.App., 1969, 443 S.W.2d 371, 374; Du Teau Co., Inc. v. New Hampshire Fire Ins. Co., 1953, 156 Neb. 690, 57 N.W.2d 663, 665; Henning v. Jefferson Standard Life Ins. Co., 5 Cir., 1942, 129 F.2d 225, 226; and Dildine v. Rimpson, Mo. App., 1951, 240 S.W.2d 214, 220.
[8] Which, parenthetically, returned to Mr. Broughton the premium it had received for writing the policy on 512 Washington Street.