In the Matter of 6804 EAST, INC., Debtor.

KEY PETROLEUM, Plaintiff,

v.

6804 EAST, INC., Defendant.

Bankruptcy No. 83–1706.
Adv. No. 82–710.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Sept. 20, 1984.

Francis H. Cobb, Tampa, Fla., for plaintiff.

Albert I. Gordon, Tampa, Fla., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case and the matter under consideration is a contract action brought by the Plaintiff, Key Petroleum, Inc. (Key), against 6804 East, Inc. (Debtor). The above-styled adversary proceeding was commenced by a two count complaint filed by Key. Key seeks specific performance of a lease and marketing agreement entered into with the Debtor. In addition, Key also seeks an accounting for amounts allegedly due to it under the Marketing Agreement and damages resulting from an alleged breach of the agreement. In the alternative, Key seeks to remove any equipment it installed pursuant to the agreement.

The facts pertinent to a resolution of the issues adduced at trial may be summarized as follows:

Key first became involved with the Debtor when William Davenport, the President and principal stockholder of Key, was approached by Allen Wolfson, Cesar Rodriguez and John Eloin, the principal shareholders of the Debtor and invited him to become a shareholder of the Debtor and to assist them in converting a motel operation into a self-service truck stop. Mr. Davenport agreed to become a shareholder upon the condition that his corporation, Key, be the managing entity for the Debtor and that the other shareholders of the Debtor will have nothing to do with the management of the truck stop.

On March 15, 1979, Key and the Debtor executed a Lease and Marketing Agreement whereby Key leased from the Debtor property located at the truck stop for a term of ten years; agreed to install fuel tanks, pumps, equipment and canopies at a cost of over $200,000. The Agreement fur-

ther provided that the equipment was to remain the personal property of Key and was to be maintained by Key at its own expense and in the event the agreement was cancelled, Key had 60 days from the date of cancellation to remove the equipment or the equipment would become property of the Debtor.

The Marketing Agreement also provided that only petroleum products purchased from Key were to be dispensed through the equipment. The Debtor was to pay Key, Key's cost for the product plus two cents per gallon or any industry index based on the availability of the product.

Key charged the Debtor two cents per gallon in order to recoup the investment they made on the equipment and to make a profit on the fuel sold at the location. Key estimated that this truck stop would sell approximately 250,000 gallons per month and eventually the sales would rise to 300,-000 gallons per month. It is clear that the Debtor never reached the projected sales and its sales averaged only 135,000 gallons per month.

From November of 1979 until February of 1980, when a fire destroyed the truck stop restaurant, Key performed accounting services and acted as a purchasing agent for the Debtor. After the fire until July of 1982, Key took over the total management of the facility. However, after the fire, the shareholders of the Debtor, contrary to the Agreement, started to intervene in the management of the truck stop. This led Mr. Davenport to decide to withdraw from the affairs of the Debtor and discontinue the management of the facilities of the Debtor by Key.

In June of 1980, Mr. Davenport, along with Mr. Moore, Key's vice president, and Mr. Copeland, Key's vice president of finance, met with Mr. Wolfson and Mr. Rodriguez to discuss the management of the truck stop. The parties agreed that Key would no longer manage the facility, and the management of the truck stop will be resumed by the Debtor and Key would limit its involvement to sales of fuel products to the Debtor. There was no discus-sion between the parties of any release of the mutual obligations flowing from the Lease and Marketing Agreement.

It appears, however, that before Davenport agreed to turn over his stock in the Debtor corporation, he required the other stockholders to arrange to have him released from any liability as a guarantor on notes of the Debtor which were then outstanding with the Metropolitan Bank, all of which were in default. Mr. Wolfson did arrange to have Mr. Davenport removed as guarantor on the notes to Metropolitan. In order to obtain the release on the notes, Mr. Davenport had to purchase a piece of real estate from Wendal Hall and assume the existing indebtedness on the property owed to Metropolitan.

The attorney for Mr. Davenport and Key, Mr. Gardner, then prepared the documents to transfer Davenport's interest in the Debtor corporation and the purchase of the property from Hall. While preparing the documents, Mr. Gardner became concerned that the other shareholders may bring a suit against either Mr. Davenport or Key for alleged mismanagement of the truck stop. With this possibility in mind, he also prepared a mutual release of all obligations of the parties. At the time the documents were prepared, Mr. Gardner was also the attorney for the Debtor and an officer in both the Debtor corporation and Key.

On July 2, 1980, Mr. Davenport and Mr. Moore met with Mr. Wolfson and his attorney to execute the documents. Immediately prior to the execution of the Mutual Release Agreement, Mr. Gardner announced that its purpose was to prevent any litigation against Mr. Davenport or Key Petroleum after Davenport ceased being a shareholder and after Key turned over all of the books and records. Mr. Wolfson and his attorney reviewed the document and then Mr. Wolfson signed it. The relevant portion of the Agreement reads as follows:

1. That 6804 and the Stockholders, or either of them, hereby remise, release, acquit, satisfy, and forever discharge Key and Davenport, or either of them, of

and from all, and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which said 6804 and the Stockholders, or either of them, ever had, now have or which any personal representative, successor, heir or assign, hereafter can, shall or may have, against the said Key and Davenport, or either of them, for, upon or by reason of any matter, cause or thing whatsoever arising in connection with 6804 or Cigar City/Auto Truck Plaza, from the beginning of the world to the day of these presents.

2. That Key and Davenport, or either of them, hereby remise, release, acquit, satisfy and forever discharge 6804 and the Stockholders, or either of them, of and from all, and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments executions, claims and demands whatsoever, in law or in equity, which said Key and Davenport, or either of them, ever had, now have or which any personal representative, successor, heir or assign hereafter can, shall or may have against the said 6804 and the stockholders, or either of them, for, upon or by reason of any matter, cause, or thing whatsoever arising in connection with 6804 or Cigar City Auto/Truck Plaza, from the beginning of the world to the day of these presents.

After the execution of the July Release Agreement, Key continued to supply the truck stop with fuel for a while, but sometime later Key failed to receive any requests for fuel and the Debtor began buying fuel at a cheaper rate on the spot market. Notwithstanding that the Debtor no longer purchased fuel from Key, Key began billing the Debtor two cents for every gallon pumped through the equipment regardless from whom the fuel was purchased. This arrangement continued until April of 1981 at which time the Debtor became delinquent on its account with Key. Key, not having received payment of the account, physically locked up the pumps. After this incident, the Debtor resumed paying the invoices submitted by Key which, just as previously, included charges for fuel purchased by the Debtor from other suppliers and contained references to the Marketing Agreement. In December of 1981, the account again became delinquent and Key demanded payment of the balance which is in excess of $33,000 and which the Debtor failed to pay.

This is the basic factual background of the transaction between the parties which, according to Key, established its claim for relief set forth in the Complaint.

In defense of the claims asserted by Key, it is the contention of the Debtor that the Release and Marketing Agreement is unenforceable because it violates the Statute of Fraud. In the alternative, the Debtor takes the position that the Mutual Release Agreement executed on July 2, 1980 cancelled the Lease and Marketing Agreement and as a consequence Key's claims have been released. Key recognizes the fact that the Mutual Release Agreement purported to release the Debtor of all of its obligations flowing from the Lease and the Marketing Agreement. Nevertheless, Key contends that this Court should reform the Release Agreement in order to reflect the true intent of the parties.

 Under Florida law, a court of equity may reform a written instrument which does not conform to the true intentions of parties. *Jacobs v. Parodi*, 50 Fla. 541, 39 So. 833 (1905); *Alexander v. Kirkham*, 365 So.2d 1038 (3rd DCA Fla.1979). In order to conform the instrument to reflect the intent of the parties, the right to reform must be grounded upon fraud, inequitable conduct, accidents, inadvertance or mistake. *Hardaway Timber Co. v. Hansford*, 245 So.2d 911 (3rd DCA Fla.1971).

■ To constitute a ground for reformation, the mistake must be the same mutual mistake made by all of the parties to the document. *Hardaway Timber, supra.* Reformation based upon mistake may be a mistake of fact or of law. *Alexander, supra* 9 Fla.Jur.2d. A mutual mistake of law may occur in reducing the agreement to writing, but which because of the mistake it does not effectuate the intention of both parties or where both parties are mistaken as to the legal effect of the contract. *Alexander, supra.* As a result, equity will reform a contract when this language employed by the scrivenor fails to express what the parties mutually intended due to a mistake of the scrivenor. *Alexander, supra* p. 1040; *Gennaro v. Leeper,* 313 So.2d 70 (2d DCA Fla.1975).

■ In the instant case, the scrivenor of the Mutual Release, Mr. Gardner, was employed in a dual capacity. Not only was Mr. Gardner an officer of the Debtor, but he was also the attorney for both the Debtor and Davenport. Mr. Gardner was instructed to prepare the document which would release Key and Davenport from any possible liability arising from the management of the truck stop by Davenport and Key.

It is without dispute that prior to the execution of the Release, the parties did not discuss terminating the Marketing Agreement. At the closing where the release was executed, Mr. Gardner informed those present that the purpose of the Release was to prevent future litigation against Key and Davenport in connection with the management of the truck stop. Although the Debtor executed the Release which on its face purportedly released Key and Davenport from all contracts with Key, the Debtor continued to perform under the Marketing Agreement for approximately one and a half years after the execution of the Release. Key continued to charge the Debtor two cents per gallon pursuant to the Marketing Agreement and the Debtor continued to pay the invoices. The Debtor did not assert that the Marketing Agreement had been terminated until litigation began and when almost two years had lapsed since the Release was executed.

As noted earlier, Key installed costly gasoline pumps, canopy, pavement and piping at the truck stop at its own expense expecting, of course, to recoup its investment from the two cents per gallon charge called for by the Marketing Agreement. It is evident that had Key intended to terminate the Marketing Agreement, it would have lost all his investment in the fixtures installed in the truck stop. Certainly Key did not intend to forego its only possible source of revenue to be derived from its investment.

In light of the foregoing, this Court is satisfied that the Mutual Release was never intended by either party to terminate the Marketing Agreement and in spite of the overbroad language used by the scrivenor, who represented both parties, the Release, as adopted, did not reflect the true intent of the parties.

This being the case, this Court is satisfied that Key is entitled to have the Release Agreement reformed to reflect the actual intent of the parties and to show that the Mutual Release Agreement shall release Key and Davenport from any liability which may arise from the management of the truck stop, but the balance of the Marketing Agreement shall remain in effect.

The Debtor also raised the Statute of Fraud as a defense to the enforcement of the Marketing Agreement. This defense is based on the contention that the price fixed by the Marketing Agreement for the fuel station is too ambiguous and cannot be enforced unless explained by parol evidence which, according to the Debtor, is not permissible because of the Statute.

■ The burden of establishing that a contract is so uncertain or indefinite to be unenforceable under the Statute of Frauds is placed upon the party asserting the defense of the Statute of Frauds. *Hefferman v. Keith,* 127 So.2d 903 (Fla. 3rd DCA 1961).

In the case at bar the Debtor has failed to establish any ambiguity which would require parol evidence. It is without dispute that the parties have operated under the Marketing Agreement for several years and there is nothing in the record that indicates that either party ever questioned the amount to be charged under the contract.

Counsel for the plaintiff shall submit a proposed Final Judgment in accordance with the foregoing memorandum opinion.