8 F.3d 760
 27 Fed.R.Serv.3d 1334
 GOLDEN DOOR JEWELRY CREATIONS, INC., a corporation and
Suisse Gold Assayer & Refinery, Inc., a
corporation, Plaintiffs,
Leach & Garner Company, Plaintiff-Intervenor-Appellee, Cross-Appellant,
Westway Metals Corp., Plaintiff-Intervenor-Appellee, Cross-Appellant,
Capital Bank and Stern Metals, Inc., Plaintiffs-Intervenors,
v.
LLOYDS UNDERWRITERS NON-MARINE ASSOCIATION, an association
licensed to underwrite insurance in the State of
Florida and Peter Frederick Wright,
Defendants-Appellants, Cross-Appellees,
Sanford Credini and Lawrence Systems, Inc., Defendants-Intervenors.
LEACH & GARNER COMPANY, Plaintiff-Appellee, Cross-Appellant,
v.
Peter Frederick WRIGHT, Defendant-Appellant, Cross-Appellee.
GOLDEN DOOR JEWELRY CREATIONS, INC., a corporation and
Suisse Gold Assayer & Refinery, Inc., a
corporation, Plaintiffs,
Leach & Garner Company, Plaintiff-Intervenor-Appellee,
Westway Metals Corp., Plaintiff-Intervenor-Appellee,
Capital Bank and Stern Metals, Inc., Plaintiffs-Intervenors,
v.
LLOYDS UNDERWRITERS NON-MARINE ASSOCIATION, an association
licensed to underwrite insurance in the State of
Florida and Peter Frederick Wright,
Defendants-Appellants,
Sanford Credini and Lawrence Systems, Inc., Defendants-Intervenors.
LEACH & GARNER COMPANY, Plaintiff-Appellee,
v.
Peter Frederick WRIGHT, Defendant-Appellant.
 Nos. 91-5223, 91-5913.
 United States Court of Appeals,
Eleventh Circuit.
 Dec. 6, 1993.
 
 Henry Burnett, Fowler, White, Burnett, Hurley Banick & Strickroot, Sam Daniels, David B. Pakula, Paul, Landy, Beiley & Harper, P.A., Miami, FL, for Peter F. Wright and Lloyds Underwriters.
 Timothy J. Armstrong, Coral Gables, FL, for Jewelers Mut. Ins.--amicus curiae.
 Ronald B. Hamilton, Cozen & O'Connor, Philadelphia, PA, for Leach & Garner.
 Joseph L. Rebak, Tew & Garcia-Pedrosa, Miami, FL, for Westway Metals Corp.
 Appeals from the United States District Court for the Southern District of Florida.
 Before TJOFLAT, Chief Judge, EDMONDSON, Circuit Judge, and DYER, Senior Circuit Judge.
 TJOFLAT, Chief Judge:
 
 
 1
 This case involves a jewelers' block insurance policy issued by defendants-appellants Lloyds Underwriters Non-Marine Association and underwriters Peter Wright, et al. (collectively "Lloyds"). The district court reformed the insurance policy and granted the motions for summary judgment filed by intervenor-plaintiffs (and appellees) Leach & Garner Company ("Leach") and Westway Metals Corporation ("Westway") (collectively, "consignors"). See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters, 748 F.Supp. 1529 (S.D.Fla.1990) ("Golden Door I ").[1] Lloyds appealed.[2]
 
 
 2
 The most important of the ten issues the parties have raised on appeal is whether the district court erred in its determination that the insurance contract should be reformed. Each of the other issues is either subsumed by the discussion of that issue or rendered moot by our determination of that issue.[3] As we hold that summary judgment in favor of consignors was improper, we vacate the final judgment entered on their behalf and remand the case for further proceedings.
 
 
 3
 In part I, we delineate the relevant facts supporting this appeal, taking them in the light most favorable to appellants. In part II, we examine the law of reformation in Florida, particularly as it relates to the contract of insurance at issue in this case, and determine that reformation of the contract was improper.
 
 I.
 
 4
 This case was brought first in Florida state court[4] on May 5, 1983, by two Florida companies, Golden Door Jewelry Creations, Inc. ("Golden Door") and Suisse Gold Assayer & Refinery, Inc. ("Suisse Gold"), to collect on a jewelers' block insurance policy issued by their insurer, defendant Lloyds. Golden Door and Suisse Gold alleged in their two-page complaint that, due to a February 10, 1983, armed robbery, they had suffered gold stock losses of $4,271,547.45 and $5,594,770.67, respectively. They asserted that they had complied with all preconditions of the insurance policy but that Lloyds had denied payment. Thus, each claimed damages consisting of their respective losses as well as interest computed from the day of the robbery.
 
 
 5
 The Parties.
 
 
 6
 The original plaintiffs, Suisse Gold and Golden Door, were two corporations sharing common offices in a building located in North Miami. The two businesses were maintained as separate entities even though they shared common ownership: Sanford Credini and his wife, Jeni, each owned fifty percent of the stock in each company. Suisse Gold's business largely involved the purchase of scrap gold, which it then refined and sold. Golden Door, on the other hand, purchased refined gold which it then resold along with objects it manufactured from gold.
 
 
 7
 Intervenor-plaintiff (and appellee) Leach is a Massachusetts corporation that fabricates and distributes gold and other precious metals. Leach consigned gold to Golden Door pursuant to a consignment agreement and alleges that it lost over $1 million of its own gold in the theft; it also claims damages for more than $1.5 million of gold used to secure Golden Door's debts. Leach is not mentioned in any of the insurance policies under which consignors claim coverage in this case.
 
 
 8
 Intervenor-plaintiff (and appellee) Westway also consigned gold pursuant to a consignment agreement; it, however, consigned its gold to Suisse Gold. Westway alleges that it lost almost $5 million of gold (either its own or that used by Suisse Gold to secure debts) in the theft. Unlike Leach, Westway is designated as a loss payee in two endorsements to the policies.
 
 
 9
 Lawrence Systems, Inc. ("Lawrence") is also mentioned as a loss payee on a policy endorsement. Lawrence was a field warehousing company hired by Golden Door as a bailee/warehouser.
 
 
 10
 Defendant Lloyds is an insurer based in the United Kingdom. Defendant Peter Wright, an underwriter for Lloyds, is the leading underwriter on the policies here at issue. He likewise represents the other Lloyds underwriters who are listed, by number, on the policies.
 
 
 11
 The Insurance Policies.
 
 
 12
 In the late winter of 1981, Jesse Schwartz (an employee of Suisse Gold and/or Golden Door) ordered, through Suisse Gold and Golden Door's broker, Great Northern Brokerage Corporation, a jewelers' block policy from Lloyds. This first policy, which expired on March 16, 1982, was renewed as policy No. 552/243017600; the policy named the assured to be "Sanford Redin [sic] doing business as Golden Door and/or Maxi and/or Suisse Gold Assayer." Jewelers' block policies such as this one are "all risk" policies, meaning that the jewelry stock of each company, as well as jewelry delivered to or entrusted to the assured by both dealers and non-dealers, was covered against most losses (subject to certain enumerated exclusions).
 
 
 13
 The policy coverage was modified by two excess policies and various endorsements. The first endorsement, originally applied to the 1981-82 insurance contract and then extended to the renewal policy here at issue, added a Loss Payee Clause that states:
 
 
 14
 It is hereby understood and agreed that losses, if any, shall be payable to the assured and Chase Manhattan Bank, 1411 Broadway, New York, NY as their interest may appear.
 
 
 15
 All other terms and conditions remain unchanged.
 
 
 16
 (This endorsement applied solely to claims made by Golden Door.)
 
 
 17
 During the spring and summer of 1982, two excess policies were added to the base policy. The first, No. 552/243017700, dated April 13, 1992, added excess coverage on all three companies, Suisse Gold, Maxi, and Golden Door. An endorsement to this excess policy, effective September 13, 1982, increased coverage on Suisse Gold only to $6,000,000; the coverage on Golden Door and Maxi was left unchanged. The second excess policy, No. 552/243030200, increased the coverage on Golden Door to $6,000,000 on June 22, 1982; and on Suisse Gold to $3,000,000 on August 12, 1982, and then to $6,000,000 on September 13, 1982. Provisions in each of the excess coverage policies mandated that the excess coverage was subject to the provisions of the original policy.
 
 
 18
 With respect to these excess policies, two final endorsement provisions are relevant. The first, numbered 552/243030201 and attached to the second excess policy, is dated July 20, 1982, and states as follows:
 
 
 19
 It is understood and agreed that losses (if any) collected under this policy shall be payable to Lawrence Systems, Inc., 52 Executive Park, South Atlanta, Georgia, in their capacity as first mortgagee, as interests may appear.
 
 
 20
 Id., exhibit E. The second provision is included on both the September 13, 1982, endorsement to policy No. 552/243017700 and the August 12, 1982, endorsement to policy No. 552/243030201. The provision states that Westway Metals Corp., 464 Hudson Terrace, Englewood Cliffs, New Jersey 07632, is included as a loss payee, but only with respect to the Suisse Gold coverage increases.
 
 
 21
 The Robbery.
 
 
 22
 On February 10, 1983, a then-unknown burglar struck the Miami warehouse, making off with some $9 million of goods in the possession of the companies and of the companies' field warehouser, Lawrence. Lloyds refused payment on the claim, and in May of 1983, Golden Door and Suisse Gold sued.
 
 
 23
 On January 12, 1988, Sanford Credini was indicted on charges of, inter alia, conspiracy, insurance fraud, theft, and embezzlement stemming from the 1983 theft. He fled to Germany, was extradited, and pled guilty to a conspiracy offense before the United Stated District Court for the Southern District of Miami.
 
 
 24
 The History of this Lawsuit.
 
 
 25
 Lloyds filed its first two motions for summary judgment on August 15, 1985, but all proceedings were stayed for some two years so that the parties could conduct discovery. At the conclusion of discovery, Lloyds renewed its first two motions for summary judgment and ultimately filed five subsequent motions, all for summary judgment. The district court denied all but one of these motions; it granted the remaining motion in part and barred plaintiffs Credini, Golden Door, and Suisse Gold from collecting on the policy.
 
 
 26
 Each consignor also filed a motion for summary judgment, both of which the district court granted. The district court found several alternative theories by which it might grant consignors' motions for summary judgment. The district court first examined the jewelers' block policy and determined that the policy covered not only property but also covered the assured against legal liability as to the property in its possession. Golden Door I, 748 F.Supp. at 1537-40. Then, the district court found that whether the consignors' recovery was based on this legal liability theory or a third-party beneficiary theory, a similar result ensued: that the policy created interests in the consignors significant enough to create a direct right of recovery for the consignors under the policy. This direct right of recovery, which is independent of the assureds' own right of recovery,[5] could be based upon one of three theories: upon consignors' status as third-party beneficiaries; upon the legal liability of the assureds to consignors (for failing to fulfill the consignment agreements between the assureds and consignors); or, if the court were to reform the insurance policy, upon consignors' status as lender loss payees and/or named co-insureds.[6] Thus, "based upon the legal liability of the named assureds to [consignors] under the terms of those parties' respective consignment agreements, and the substantial interests resulting therefrom," the district court reformed the insurance policies to provide consignors with a right of direct recovery and thereby "effectuate the true purposes and objectives of the jeweler's block policy, and hence what [the district court] perceive[d] to be the intent of the parties entering into a contract for coverage thereunder." Id. at 1543.
 
 
 27
 Then, in response to Lloyds' arguments that the policy contained coverage exclusions, the district court ruled that it would reform the contract such that consignors had a direct right of recovery (akin to lender loss payees) not subject to defenses assertable against the named assureds. Id. at 1543-46. To this end, the court ordered that the jewelers' block policy be reformed to include consignors as lender loss payees and/or named co-insureds, id. at 1547, and subsequently entered final judgment on consignors' behalf.
 
 II.
 
 28
 These cases were decided by the district court on consignors' motions for summary judgment. In accordance with Fed.R.Civ.P. 56 and the seminal interpretation of Rule 56, Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), summary judgment is inappropriate if genuine issues of material fact remain. Thus, as appellants have challenged the district court's summary judgment order, this court must examine the record de novo to ensure that there are no such genuine issues. See Tackitt v. Prudential Ins. Co., 758 F.2d 1572, 1574 (11th Cir.1985).
 
 
 29
 Lloyds also has challenged the district court's legal conclusions and the practical application of those conclusions to the present case. Questions of contract interpretation are subject to de novo review by this court. Wheat, First Sec., Inc. v. Green, 993 F.2d 814 (11th Cir.1993).
 
 A.
 
 30
 Lloyds raises several issues on appeal. The first challenge, in which Lloyds contends that the district court erred in its determination that the jewelers' block policy included liability as well as property coverage for the assured is a necessary precursor to our review of the propriety of the district court's reformation of the insurance policy. We determine that Lloyds' contention is meritless.
 
 
 31
 Although the district court went into great detail in resolving this issue, a cursory glance at the policy itself demonstrates conclusively that the policy includes legal liability. The third paragraph of the policy, entitled "Property Insured," lists three types of property covered under the policy. The district court found, and this court agrees, that the property at issue in this case falls into the third class of property, which is defined as follows:
 
 
 32
 Property ... delivered or entrusted to the Assured by others who are dealers in such property or otherwise engaged in the jewelry trade, but only to the extent of the Assured's own actual interest therein because of money actually advanced thereon, or legal liability for loss of or damage thereto.
 
 
 33
 Paragraph 3(C) (emphasis added). In short, the policy's language clearly and specifically encompasses legal liability. The court's conclusion is bolstered by language elsewhere in the policy. For instance, the condition recited in Paragraph 11 (which determines the priority of coverage if other policies cover the property) undeniably states that the condition does not apply "to the legal liability of the Assured." Paragraph 11. The conclusion is inescapable: the jewelers' block policy includes coverage for the legal liability of the assured deriving from the loss of property. See Highlands Ins. Co. v. City of Galveston, 721 S.W.2d 469 (Tx.Ct.App.1986) (construing equivalent language to provide coverage for legal liability as well as property).
 
 B.
 
 34
 The district court proceeded from this conclusion to a determination that consignors possessed a direct right of recovery under the jewelers' block policy; thus, the district court reformed the policy to effectuate this finding. The district court's reasoning and the reformation that results from it, however, contravene the obvious intent of the parties and the law of reformation in the State of Florida.[7]
 
 1.
 
 35
 In Florida, there is a "strong presumption arising from [an insurance] policy that it correctly expresses the intention of the parties." Niagara Fire Ins. Co. v. Allied Elec. Co., 319 So.2d 594, 595 (Fla.3d DCA), cert. dismissed, 322 So.2d 925 (Fla.1975). With this presumption against reformation, it is not surprising that Florida courts require that parties seeking to reform a contract demonstrate not by a mere preponderance of the evidence, but rather by clear and convincing evidence, that the policy did not accurately reflect the parties' agreement. Id. Accord Continental Casualty Co. v. City of Ocala, 99 Fla. 851, 127 So. 894 (1930). Like most courts, Florida courts have sharply delimited a narrow range of circumstances that will support reformation: fraud, inequitable conduct, accident, inadvertence, and mutual mistake. See, e.g., Matter of 6804 East, Inc., 42 B.R. 903, 906 (Bankr.M.D.Fla.1984); Camichos v. Diana Stores Corp., 157 Fla. 349, 25 So.2d 864, 869 (1946).
 
 
 36
 In this case, only mutual mistake forms a potential ground for reformation. The only possible mistake is one as to the legal effect of the contract, not one of fact.[8] To determine whether the hypothesized mistake in this case satisfies Florida's stringent standards for reformation, it is necessary to compare those cases in which Florida courts have addressed the availability of that doctrine.
 
 2.
 
 37
 A quick glance at cases in which Florida courts have denied reformation conclusively demonstrates that no mutual mistake existed here and that reformation of this jewelers' block policy was inappropriate. Although no reported case presents facts exactly like those in the present case, Old Colony Ins. Co. v. Trapani, 118 So.2d 850 (Fla.2d DCA 1960), provides the closest analogy. In that case, although the insured and the insurer's agent were mistaken as to the extent of coverage under an insurance policy, the insurer (as demonstrated by the policy it wrote and other evidence) did not intend the coverage plaintiff later claimed. Since "neither party contemplated the type coverage which was subsequently sought by plaintiff in its suit for reformation," id. at 853-54, the Court of Appeals forbad reformation of the insurance policy. The facts of the present case--as well as the appropriate legal conclusion this court should draw from them--hardly are distinguishable.
 
 
 38
 Similarly, in Swede v. Metropolitan Life Ins. Co., 94 F.2d 124, 126 (5th Cir.1938), the evidence demonstrated "conclusively that one of the parties did intend this contract, and did not agree to or intend any other." Thus, as here, the insurance company issued exactly the policy--with exactly the coverage--that it intended and no reformation of the policy was permissible. Again, in Southeastern Fidelity Ins. Co. v. Broughton, 293 So.2d 139 (Fla.1st DCA 1974), the court determined that the insured's error as to which house was covered by an insurance policy was not a mutual mistake; thus, the policy could not be reformed. See also Canal Ins. Co. v. Hartford Ins. Co., 415 So.2d 1295 (Fla.1st DCA 1982), rev. den'd, 424 So.2d 761 (Fla.1983) (denying reformation where policy reflected intent of insurer based on application of assured); Babcock v. United Services Auto. Ass'n, 501 So.2d 679 (Fla.3d DCA 1987) (refusing to reform where assured did not request specific policy, insurer did not write the type of policy assured desired, and contract accurately reflected parties' mutual intent).
 
 
 39
 On the other hand, cases in which Florida courts have found it proper to reform the contract include cases such as a "simple mistake" as to the identity of the named insured (Lumbermens Mut. Cas. Co. v. Martin, 399 So.2d 536, 537 (Fla.3d DCA), rev. den'd, 408 So.2d 1094 (Fla.1981)); a mutually mistaken endorsement which inadvertently deleted fleet insurance coverage (Boston Old Colony Ins. Co. v. Popple, 305 So.2d 877 (Fla.1st DCA 1974)); and a mutual mistake as to the inclusion of a policy exclusion (Niagara, supra ).
 
 
 40
 This case is not one of a "simple mistake." In the above cases, reformation served to correct minor errors where the evidence demonstrated that there had been a meeting of the minds as to the would-be provisions of the contract. Here, on the other hand, rather than both parties clearly and unequivocally agreeing to a contract provision and then erring in the committing of that agreement to paper, there was no agreement as to the greatly expanded coverage provided by the district court's reformation.
 
 
 41
 For instance, the record indicates that Lawrence was added to the policy not because of a mistake (as consignors claim), but because the agreement between plaintiff companies and Lawrence required it. There also is evidence (as there was in Babcock ) that Lloyds does not write policies that provide the type of coverage that would exist here if consignors' reformation is allowed.[9] In fact, the district court implicitly admitted that there is no actual mutual mistake when it determined that the parties
 
 
 42
 are said to have anticipated and accounted for the fact that in the jewelry business, substantial portions of the goods held by dealers are often held on consignment from other dealers.... [Thus,] a substantial interest is created in the consignor of the goods covered--an interest which must be accounted for in the agreement between the parties.
 
 
 43
 Golden Door I, 748 F.Supp. at 1544.[10] In other words, the district court imputed states of mind to at least one of the parties (if not both, as the thoughts of Mr. Credini are not represented in the record) to this insurance contract. Having described the parties' states of mind, the district court also imputed to the parties a mutual mistake on which it might base reformation of this policy.[11]
 
 
 44
 Contrary to this hypothesized mistake, however, the record indicates that there was a meeting of the minds as to the coverage Lloyds was extending to consignors. Both Lloyds and Mr. Schwartz (on behalf of Golden Door and Suisse Gold) assumed that consignors would have coverage; the coverage they anticipated, however, was within the terms and exclusions of the policy. Therefore, if a genuine theft had occurred, Lloyds acknowledges that consignors would have recovered their losses. It is also apparent that neither party contemplated that consignors' rights were outside the terms of the policy; otherwise, the explicit language in the endorsement, "[a]ll other terms and conditions remain unchanged," would be meaningless.
 
 
 45
 A comparison of the facts in these cases to the facts in this case leads to an inescapable conclusion: reformation is not permissible in this case. Most factual circumstances do not support reformation, and wisely so. Contracts must be binding, and unless the parties can demonstrate--with clear and convincing evidence--that the contract does not reflect the parties' mutually agreed-upon terms, the courts may not reform the contract, no matter how severely one party may suffer. Here, the parties did not agree to coverage of consignors as lender loss payees or named co-insureds. Rather, the parties provided for consignors under the usual terms of the contract. The district court's hypothesis that Lloyds could or should have known that consignors existed cannot convert this jewelers' block policy into an omnibus policy granting unfettered rights in consignors.[12]3.
 
 
 46
 In light of the precedent established by the Florida courts, therefore, it is impermissible to reform the present insurance contract. Instead of clear and convincing evidence of a mutual mistake on the part of the parties, there is evidence that at least one party (Lloyds), and quite possibly both parties, meant that the policy's coverage be limited to that coverage specifically delineated in the text of the policy. The reformation of the policy here at issue therefore must be set aside.
 
 C.
 
 47
 Once the district court reformed the policy to create a direct right of recovery in consignors, it then proceeded to clarify its reformation and held that consignors were not subject to the exclusions placed in Paragraph 5(A) of the policy. That exclusion foreclosed coverage for
 
 
 48
 [l]oss, damage or expense caused by or resulting from sabotage, theft, conversion or other act or omission of a dishonest character (1) on the part of the Assured or his or their employees, or (2) on the part of any person to whom the property hereby insured may be delivered or entrusted....
 
 
 49
 Lloyds, first, appeals this determination; and, second, asks this court to rule as a matter of law that Mr. Credini's admitted theft of the gold precludes all coverage for consignors under this policy.
 
 
 50
 The district court's determination necessarily is reversed by the holding in part II.B., above; thus, the first part of Lloyds' requested relief is granted. This court may not, however, accede to Lloyds' wishes as to their second request for relief. At this point in the litigation, the guilt or innocence of Mr. Credini and other parties has not been established before the district court. In fact, based on its determination that consignors possessed a direct right of recovery, the district court specifically did not rule on or even discuss the potential efficacy of any defenses based upon the alleged misdeeds of Mr. Credini and plaintiff corporations. Thus, the question of whether the facts of this case satisfy this coverage exclusion must be determined by the district court on remand.
 
 D.
 
 51
 The only remaining issue[13] the court must address concerns the effect Lloyds' payments to fact witnesses should have on this case. Consignors argue that, due to some $750,000 in payments Lloyds made to these witnesses, Lloyds' pleadings should be stricken (an argument Westway made to the district court as well). A special master, assigned by the district court to handle discovery issues, ruled that sanctions of this sort were inappropriate. In its Omnibus Order, the district court adopted the report of the special master and declined to sanction Lloyds in any fashion.
 
 
 52
 Consignors first argue that the district court's adoption of the special master's report violated Fed.R.Civ.P. 53(e)(2) which, consignors allege, requires that the district court hold a hearing before adopting the special master's report. In its papers filed before the district court, however, Westway clearly stated that "Fed.R.Civ.P. 53(e)(2) provides for written objections to a special master report." At no time did consignors suggest to the district court that oral argument was either desired or required. This court will not overturn the district court's adoption of the special master's report on a procedural technicality consignors have discovered only on appeal.
 
 
 53
 However, consignors also have requested that this court address the merits of its contentions. That determination, of course, is properly accomplished first in the district court; only then, on an appeal from the district court, should this court address the issue. It is apparent from the district court's Omnibus Order that it did not address the issues consignors have noted for appeal. The district court noted that "[t]he underlying issues are rendered moot by the terms of the ruling contained herein and in the Court's Order of October 11, 1990." Golden Door II, 758 F.Supp. at 723. The district court further noted that it did not address the issue as "the matter [is] otherwise addressed on the merits as a matter of law." Id. at 723 n.6. Thus, since it had already ruled in consignors' favor, the district court did not need to, and therefore did not, address these claims.
 
 
 54
 This decision, however, makes these issues once again relevant. Rather than addressing these issues on a blank slate, this court finds it appropriate to remand these questions to the district court for further proceedings as necessary.
 
 III.
 
 55
 The district court reformed the insurance policy in this case despite the fact that the facts of this case do not support reformation. As a result, the final judgments entered on behalf of consignors must be vacated. The case is remanded to the district court for further proceedings not inconsistent with this opinion.
 
 
 56
 IT IS SO ORDERED.
 
 
 
 [1]
 The district court also issued an Omnibus Order addressing all post-order motions on February 21, 1991, in which it affirmed its earlier findings and modified its order granting consignors' motions for summary judgment. Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters, 758 F.Supp. 708 (S.D.Fla.1991) ("Golden Door II ")
 
 
 [2]
 The district court entered final judgment--in an amount of approximately $15 million--on behalf of consignors under Fed.R.Civ.P. 54(b). This court possesses jurisdiction to entertain these appeals pursuant to 28 U.S.C. § 1291 (1988)
 
 
 [3]
 A second case, No. 91-5913, accompanies this appeal. In this companion case, defendants (and appellants in No. 91-5913 as well) ask this court to determine whether the district court's award of attorneys' fees is proper. Both consignors, the appellees in No. 91-5913, concede in their briefs that if this court reverses the judgment entered by the district court, appellees are not entitled to attorneys' fees. As this court indeed does reverse the district court and vacate the judgments entered on behalf of appellees, the appeal is deemed conceded and the award of attorneys' fees is vacated
 
 
 [4]
 Based on the diversity of citizenship of the parties, Lloyds removed the action to the United States District Court for the Southern District of Florida that same year
 
 
 [5]
 The district court earlier had foreclosed the assureds' right of recovery as part of its ruling on Lloyds' motions for summary judgment. See Golden Door I, 748 F.Supp. at 1535-36
 
 
 [6]
 In the view of the district court, status as either a lender loss payee or a named co-insured would give consignors an independent right of recovery under the insurance policy
 
 
 [7]
 As a preliminary matter, we will assume for purposes of this appeal that the district court was correct in its finding that Golden Door and Suisse Gold were liable to consignors for the value of the lost gold (whether that liability was based on consignors' equitable or actual ownership). Despite this assumption, however, it does not necessarily follow that the parties, when agreeing to the policies and the endorsements, made a mutual mistake such that reformation is proper
 
 
 [8]
 A mistake as to legal conclusions may be sufficient in some cases to warrant reformation. See, e.g., 6804 East, 42 B.R. at 907
 
 
 [9]
 See affidavit of Norman Newman in which Mr. Newman avers that the jewelers' block policy was not intended to provide independent coverage to consignors
 
 
 [10]
 The district court also stated that Lloyds was accountable for knowledge it could have gained through reasonable diligence (such as that parties other than the named assured were the actual or beneficial owners of much of Golden Door's and Suisse Gold's stock)
 
 
 [11]
 The most that can be said on the record in this case is that Lloyds intended to provide coverage to Westway--a loss payee under one of the endorsements--subject to all terms and exclusions in the policy. An interest indeed may have been created in consignors (as the district court found), but that interest was within--not without--the terms of the policy and was not significant enough to give consignors a direct right of recovery
 
 
 [12]
 The cases cited by the district court in support of its reformation are not contrary to this conclusion. In three of those cases, the parties mutually, and erroneously, assumed that their contract had specific legal consequences; thus, reformation was proper to effectuate the parties' mutually agreeable goals. For instance, in Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co., 420 F.2d 1211, 1214 (5th Cir.1969), the evidence demonstrated "clearly that the parties intended to insure the interest in the Tampa building of the owner of that building." Thus, when the owner's name was omitted, reformation was proper. Here, by contrast, there is no evidence that Lloyds intended to provide independent coverage to the owners of the stolen gold
 Likewise, in Manhattan Fire & Marine Ins. Co. v. Sommers, 222 So.2d 450 (Fla.4th DCA 1969), the parties, by mutual mistake, named a corporation and not a partnership as the named insured; reformation was proper. Similarly, in Erickson Refrigerated Transp., Inc. v. Canal Ins. Co., 474 S.W.2d 337 (Mo.Ct.App.1971), the insurer agreed to protect the assured's interest, yet the contract did not reflect that agreement.
 Only in Taylor v. Audubon Ins. Co., 357 So.2d 912 (La.Ct.App.), writ den'd, 359 So.2d 1307 (1978), did the court grant a reformation even though it was apparent the parties had not reached a "meeting of the minds." The court limited its holding to the specific facts of that case, however, and this court believes that the dissenting opinion, which argued against reformation, reached the proper outcome. In any event, the decision of a state appellate court in Louisiana is not binding on this court, particularly when its opinion is contrary to the rule of law in Florida.
 
 
 [13]
 The court need not address one issue raised by consignors, to wit, the applicability of § 627.7262, Fla.Stat. (1991). Lloyds concedes that this statute does not apply to jewelers' block policies. Given this admission, the court does not address the issue but notes that Lloyds obviously is now precluded from raising the statute as a defense to a direct suit by consignors